# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3353

_____

Bobbie Brown,                    *
                                 *
            Appellant,           *
                                 *    Appeal from the United States
    v.                           *    District Court for the
                                 *    Eastern District of Arkansas.
Michael J. Astrue, Commissioner  *
of Social Security,              *
                                 *
            Appellee.            *

_____

Submitted: February 12, 2010
Filed: July 26, 2010

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Bobbie Brown appeals the district court's[2] affirmance of the administrative law judge's (ALJ) denial of Brown's application for disability insurance benefits (DIB) under Title II of the Social Security Act. Brown contends that the ALJ's determination

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

[2]The Honorable Beth M. Deere, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

that she is not disabled is not supported by substantial evidence on the record as a whole and is inconsistent with the medical evidence and the opinion of Brown's treating physician. We affirm.

## I. *Background*
### A. *General Background*

Brown claimed disability based on, inter alia, "anxiety problems."[3] At the time that the ALJ denied her application for benefits, Brown was 50 years old with two years of college education. She had past relevant work experience as a cashier, assembly line worker, and customer service representative. Brown quit her job as an assembly line worker in 2004 because of her nervousness and anxiety. She last worked in 2004 or 2005 for two to three months, two to three days a week, as a substitute teacher. According to Brown, she has experienced problems with her nerves for years, but the problem has worsened as she has aged. Her medications at the time of the hearing included Seroquel, Alprazolam, iron for anemia, and Aleve for headaches. Her daily life activities include getting her daughter off to school in the mornings, cleaning the house, cooking, going to the gym twice a week, visiting her mother, driving, and regularly attending church and Bible study.

According to Louis Brown ("Louis"), Brown's husband, Brown is unable to work eight hours a day, five days a week. He stated that her nerves caused her trouble at work. On one occasion, when Louis returned home from work, Brown did not recognize him and was walking through the house talking to herself.

Latasha Anthony, Brown's daughter, reported that "[e]ven when treatment is effective, persistent consequences of the illness[,] lost opportunities, stigma, residual

---

[3]In her application, Brown also claimed disability based on "bladder problems." Brown has not pursued her claim of disability based on urinary incontinence in her appeal of the ALJ's decision. Therefore, we will only review the ALJ's determination that Brown's mental condition did not render her "disabled" under the Act.

symptoms and medication side [e]ffect[s] may be very troubling." According to Anthony, Brown often appears confused and "sometimes cannot concentrate on one thought for very long and may be easily distracted or unable to focus her attention." Anthony stated that, at times, Brown withdraws socially, avoiding contact with others and not speaking.

## B. *Medical Evidence*

Dr. George Conner, Brown's primary care physician, has treated Brown since the end of 2001. On March 22, 2002, Brown saw Dr. Conner with complaints of an inability to control her emotions, moodiness, and an inability to sleep. Dr. Conner diagnosed depression with anxiety and prescribed Effexor. Then, in January 2003, Dr. Conner prescribed Ativan to Brown after she complained of difficulty sleeping and nerves in response to the recent death of her sister. During a follow-up examination on February 12, 2003, Dr. Conner treated Brown for, inter alia, anxiety and dysphoria. During the visit, Brown stated that "Ativan helps" and "prayer helps" but that she did not "feel able to face [her] responsibilities [at] work."

On March 4, 2003, Dr. Conner opined that Brown had, inter alia, "resolving anxiety/depression" and was "doing better [with her] mood," "[b]etter able to concentrate," and "less anxious." On August 27, 2003, Dr. Conner treated Brown for, inter alia, anxiety and prescribed Ativan.

During Brown's visits to Dr. Conner for various ailments in March and June 2004, Dr. Conner noted Brown as having normal mood, memory, judgment, and insight. But on August 2, 2004, Brown complained to Dr. Conner of stress, and Dr. Conner prescribed Lexapro and recommended that she remain off work for two weeks. During a follow-up appointment on August 20, 2004, Brown reported that she was "feeling better but still [was] not always sleeping at night [because] sometimes [her] mind seem[e]d to keep running when she [was] tired." Dr. Conner diagnosed stress, instructed Brown to continue Lexapro, and continued her work release until

September 7, 2004. On September 3, 2004, Brown again saw Dr. Conner, reporting that she was "feeling less depressed [and] still forgetful but [was] improving with less stress and resting better." Brown indicated that she thought she "may not go back to work but [was] undecided." Dr. Conner's assessment was that Brown had stress and depression; he advised Brown to continue taking Lexapro.

On February 15, 2005, Brown applied for DIB. She alleged disability since July 28, 2004, primarily due to anxiety. During an appointment with Dr. Conner on February 23, 2005, Brown complained of problems sleeping and forgetting things, and Dr. Conner prescribed Paxil for anxiety and recommended counseling. Thereafter, on April 26, 2005, Brown underwent a mental status evaluation by Charles Spellman, Ph.D. Brown reported going to a mental health center for anxiety and depression when she was in her 20's but stated that she had not been back for mental health services since that time. Brown told Dr. Spellman that she was depressed and anxious and that her mind wandered, causing her to lose her attention. In his report, Dr. Spellman noted that Brown "was coherent and relevant throughout the evaluation" and that she "was a pleasant woman who talked too much." He said that she "talks constantly, punctuating her sentences with smiles and casting about of her big eyes. She talked about being abused, her depression, her anxiety, and other bad things all the while casting smiles. It was as if she was talking about bad things but enjoying talking about them." He reported that she was animated and never cried or appeared to be in distress; in fact, he said that she was quite relaxed.

As to Brown's stream of mental activity, Dr. Spellman opined that she was spontaneous and that her thought processes "were logical and well organized. Her speech was not pressured so much as it was that she seemed to just like to talk a lot." He surmised that Brown controls social situations by being facile with words. As to her thought control, he said that Brown's "contact with reality appeared good" and that "[t]here was no evidence of hallucinations, delusions, obsessions and unusual powers." When Dr. Spellman asked Brown what she was depressed about, Brown

-4-

replied that she did not know. As to her anxiety, she said, "I will tell you the truth, I don't know what that means. I just feel funny. My head tingles like your skin does when it is numb. Sometimes I just burst out in sweats." Dr. Spellman opined that Brown "has heard the word 'depression' paired up with anxiety so she always included them together. Although, she did not know the definition of anxiety. She didn't describe symptoms, which were necessarily anxiety generated." Brown reported "flashbacks" of emotional, mental, and physical abuse during her first marriage, and Dr. Spellman indicated that this abuse explained her depression.

Dr. Spellman opined that Brown was in contact with reality and had appropriate orientation with respect to "time, person, place." He estimated her IQ to be 71 to 79. He observed that although Brown complained of memory problems, they "did not seem significant enough to warrant a diagnosis at this time." He rated her communication skills as "good in all areas." Socially, he believed that Brown got along fine with others, and he saw no evidence of "unusual passivity, dependency, aggression, impulsiveness, or withdrawal." He noted that Brown

> fixes complete meals, goes shopping for groceries, drives a vehicle, and attends church regularly. She pays bills. She manages the family money. She has friends . . . . She is involved in her daughter's school activities . . . . A typical day might include visiting her mother, doing housework, checking on her daughter at school . . . Her plans are that, perhaps, she would like to travel in the future but not [too] far at one time.

According to Dr. Spellman, Brown's concentration, persistence, and pace were adequate and she did not have significant limitations in adaptive functioning in two or more areas. He stated that no evidence of exaggeration or malingering existed and that she could handle her benefits if they were awarded. Ultimately, he diagnosed Brown with Post Traumatic Stress Disorder (PTSD).

On May 4, 2005, Dr. Kathyrn M. Gale, an agency reviewing physician, examined Brown's files and concluded that Brown had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Dr. Gale, who relied in part on Dr. Spellman's evaluation, stated that Brown's functioning was not markedly limited and that she could do semi-skilled work. Regarding Brown's ability to function mentally, Dr. Gale concluded that Brown had no significant limitations in 18 of 20 areas, including Brown's ability to understand and remember simple and detailed instructions and her ability to work in coordination or proximity to others without being distracted by them. Dr. Gale found that Brown had moderate limitations in two areas: the ability to maintain attention and concentration for extended periods and the ability to complete a normal work day without interruptions from psychologically based symptoms. Despite these limitations, Dr. Gale opined that

> [Brown] is able to perform work where interpersonal contact is routine but superficial, e.g.[,] grocery checker; complexity of tasks is learned by experience, several variables, uses judgment with limits; supervision required is little for routine but detailed for non-routine.

Jerry Henderson, Ph.D., a psychologist, agreed with Dr. Gale's assessments.

Following her examination by Dr. Gale, Brown reported to Dr. Conner on August 17, 2005, that she was experiencing episodes of fear and worry but could not identify any particular stress. According to Brown, she was feeling anxious and not tolerating family stress well; additionally, traveling in a car made her very nervous. Dr. Conner diagnosed anxiety and possible hypertension and prescribed Ativan and Zoloft. During September 2005, Brown complained of feeling anxious and an inability to work. She reported that Zoloft was not helping her anxiety, and Dr. Conner prescribed Paxil and Lorazepam. In October 2005, Dr. Conner diagnosed Brown with improved generalized anxiety disorder. According to Dr. Conner's notes, Brown's

mood and anxiety seemed better. Dr. Conner prescribed, inter alia, Paxil and Lorazepam.

In January 2006, Brown complained to Dr. Conner that she was "under a lot of stress at home" and "not resting well." He again diagnosed her with anxiety and prescribed, inter alia, Lorazepam. Two months later, he prescribed Ambien. On April 4, 2006, Brown reported to Dr. Conner that she was unable to sleep, was stressed a lot, and felt "jumpy." Dr. Conner indicated in his notes that Brown "doesn't like to take meds." He assessed Brown with insomnia, stress, and headaches and prescribed Zoloft. A few days later, Dr. Conner replaced Zoloft with Lorazepam. On April 17, 2006, Brown reported that she was still stressed a lot, was not sleeping well, and was experiencing occasional headaches. Dr. Conner diagnosed insomnia, headaches, and depression/stress and prescribed Ambien and Lexapro.

At the end of April 2006, Brown went to Baptist Memorial Hospital in Memphis, Tennessee ("Baptist"), with complaints of nervousness and atypical chest pain. Her ECK and ECG were normal. Dr. Andrew Watson observed that Brown's primary care physician had prescribed Zoloft but that Brown "has only taken three doses of it and then quit." A few days after Brown's hospital visit, she complained to Dr. Conner that she could not sleep and heard voices "when lying down." She also stated that "Lexapro made her nervous." Dr. Conner discontinued the Lexapro and prescribed Seroquel for sleep. Brown subsequently complained that Seroquel made her break out in a sweat, but Dr. Conner noted that Brown had no other problems with Seroquel and that it did help her rest at night with no other side effects. Dr. Conner diagnosed insomnia and prescribed Ambien.

On May 20, 2006, Brown was treated at the Forrest City Medical Center Triage ("Forrest City") for difficulty sleeping. She was diagnosed with non-specific depression and anxiety, given an injection, and prescribed Ambien. The next day, Brown returned to Baptist, reporting that she was unable to sleep. She was diagnosed

with insomnia and anxiety and prescribed Xanax. Then, on May 27, 2006, Brown was treated at the Forrest City emergency room for heart fluttering and nerves. She was diagnosed with anxiety and prescribed Ambien for sleep. Shortly thereafter, on June 1, 2006, Brown again went to Baptist, where she was treated for sleep disturbance. She was diagnosed with acute adjustment reaction and psychosocial dysfunction, anxiety state, and insomnia. She was prescribed Ativan, in addition to the Prozac and Ambien that she was already taking. That same day, Brown was seen at Lakeside Behavioral Health System ("Lakeside"), where she was given a provisional diagnosis of possible depression and anxiety and a Global Assessment Functioning (GAF) of 45. Medical personnel recorded that Brown had no previous treatment for a psychiatric disorder and that she exhibited normal speech and thought processes and fair judgment, insight, and memory.

On June 30, 2006, Brown was admitted to the Baptist emergency room and diagnosed with psychosis. She received injections of Haldol and Ativan. Brown's family agreed to commit her for treatment. A "Certificate of Need for Emergency Admission" to a psychiatric facility was completed, in which Dr. Steven Creasy certified that Brown "has a mental illness or serious emotional disturbance" as evidenced by her "sudden onset of delusional, hallucinatory behavior." According to Dr. Creasy, this was "the first episode she has exhibited."

Brown was transferred on July 1, 2006, to Lakeside for inpatient care. A psychological assessment indicated that when Brown's husband returned home from work, Brown was "talking out of her head about religious things" and kept chanting, "Bible, Bible, drugs are sin, drugs are sin." Brown admitted problems in major life areas, including her lack of employment, loss of energy, social withdrawal, and ability to parent. She was delusional and appeared to be responding to internal stimuli. She could not respond normally to questions and had a vacant look in her eyes. Brown was given a provisional diagnosis of psychotic disorder and a GAF of 25. At the time of her admission, she was only taking Buspar. During her hospitalization, she was placed

on Ambien for sleep and Haldol injections twice a day for acute exacerbation of psychotic symptomatology. A psychiatric progress note from Dr. Radwan Khuri on July 7, 2006, indicated that Brown's general appearance, affect, mood, speech, language, thought process, and thought content were within normal limits.

During her hospitalization, Brown told a doctor that about two weeks of poor sleep preceded her delusional episode. She denied any mood problems or depression prior to the episode and stated that she had no history of visual or auditory hallucinations. According to Brown, "it was right around when she stopped [taking] Xanax that she had this breakdown." Brown's doctor described Brown as well-groomed, anxious, and oriented with clear and coherent speech. He observed that she was of average intelligence, had fair judgment, impaired insight, and fair impulse control. He assigned Brown a GAF score of 48. On July 10, 2006, Dr. Khuri discharged Brown, diagnosing her with psychosis and assigning her a GAF score of 50. Her discharge medications included Abilify, Cogentin, and Sonata.

On July 17, 2006, Brown was admitted to Counseling Consultants, Inc. as an outpatient for treatment of generalized anxiety disorder, psychosis, and possible bipolar disorder with psychotic features. She was prescribed Abilify, and the Cogentin and Sonata were discontinued. During a medication management appointment in late July, Brown was assigned a GAF of 48.

On July 28, 2006, at Lakeside's direction, Brown saw Dr. Conner for a follow-up appointment for her psychosis. His notes indicate that Brown was feeling much better and sleeping much better. He stated that Brown had "no significant anxiety" and "no obvious psychotic behavior." He found her "much improved." He increased her dosage of Abilify. A review of the administrative record reveals that although Brown continued seeing Dr. Conner on occasion from August to November 2006, she was

seeing Dr. Conner for medical conditions unrelated to anxiety, depression, or psychosis.[4]

In August 2006, Brown saw Dr. Robert W. Schriner for insomnia. Brown had quit taking Abilify because it made her too sleepy to function during the day and instead was taking Xanax. He diagnosed insomnia related to underlying anxiety and referred her to Dr. Jack Morgan, a psychiatrist.

On December 8, 2006, Dr. Morgan diagnosed Brown with depressive disorder, probable bipolar disorder, with the most recent episode being a psychotic mania, and anxiety disorder. He reported that Brown "continues to feel significantly better than at the time I first saw her." He stated that Brown had difficulty getting to sleep and staying asleep the previous evening but that Brown said she had "nothing particular . . . on her mind." According to Dr. Morgan, Brown indicated that she "get[s] a little worked up at times" when family members discuss their problems with her because "she feels there is nothing she can do." Brown informed Dr. Morgan that she had a family Christmas dinner at her home the prior evening, which may have affected her sleep, as the family ate later than usual for her. Dr. Morgan noted that Brown was working out on a regular basis and that her "[m]ood seems to be stable. At present, there isn't any overt psychotic symptomatology, delusional thinking, grandiosity[,] etc. Thought processing integrated." He assigned Brown a GAF of 70.

On January 19, 2007, Dr. Morgan reported that Brown "says that she's been feeling reasonably well, in terms of mood, level of energy[,] and interest. Brown informed Dr. Morgan that she was sleeping better, her appetite was good, and she was

---

[4]We recognize that after the ALJ's June 27, 2007 decision, Dr. Conner did see Brown on July 10, 2007, to talk about her medications. His notes indicate that the medications were "working well with psychosis." Brown told Dr. Conner that she was still having trouble with stress but that she had experienced "no psychotic episodes" since being on Seroquel.

-10-

better able "to relax more than I normally do." Dr. Morgan again noted that Brown was working out several times per week. His impression of Brown was the same as it had been on December 8, although he added that Brown "seems to be less vulnerable to day to day stressors. Her coping with normal day to day issues is apparently improved, given reduction in report of stressors or reaction to stressors." He again assigned her a GAF of 70.

On March 2, 2007, Dr. Morgan indicated that Brown "feels that she's getting good benefit from her medication" and that Brown generally felt that she was "more relaxed and 'calmed down.'" His impression was the same as December 8 and January 19, but he added that Brown "is spending more time taking care of herself" and that her "[d]ealing with stress is improved." He assigned her a GAF of 70. A few days later, Brown called Dr. Morgan to report that she was not sleeping; in response, Dr. Morgan increased the dosage of Seroquel.

On April 25, 2007, the day of Brown's administrative hearing, Dr. Conner wrote a letter on Brown's behalf, stating:

> I have been a primary care provider for Bobb[ie] A. Brown since December of 2001. I have seen her for a variety of complaints and problems. I have seen no evidence of malingering or deceptive behavior. She has suffered from anxiety and anxiety-related illness during the years I have seen her.
>
> Last year she suffered with an episode which caused psychosis and required her hospitalization. Since that time her emotional state would not allow employment. I have been concerned since that time she would not be able to return to full time employment. She has been in relatively stable condition over the past few months but because of the continued problems she has with stress and anxiety in normal daily activity, she is not able to tolerate full time employment. In my opinion, she is not able to return to work now or in the future.

-11-

Thereafter, on May 31, 2007, Dr. Morgan reported that Brown "has generally been doing fairly well" but that there were "occasions, such as the recent graduation and subsequent graduation party of her grandson where the task of going about, making preparations etc. caused some feeling of tension or emotional distress." But he noted that this emotional distress was "nothing severe." He also observed that Brown had experienced no recurrence of psychotic or manic symptoms. His impression was that although Brown "had a severe episode of illness, it seems that she is reasonably stable." He noted that Brown was unclear as to "who evaluated her for disability" and "whether it was an application for SSDI." According to Dr. Morgan,

> [i]t seems that the "agenda" may in part be related to the disability question. For the first time in a while, her husband and daughter are both here with her, with various "questions" about what I think of the issue, whether any company would hire a person who might have to occasionally be off work due to illness[,] etc.

Dr. Morgan assigned Brown a GAF of 65 and recommended that she see a counselor in addition to taking her medications.

## C. *Administrative Hearing and ALJ's Decision*

At the administrative hearing, a vocational expert (VE) testified that Brown's past relevant work as an assembly worker was light and unskilled, her past relevant work as a cashier was light and semi-skilled, and her past relevant work as a substitute teacher was light and skilled. The ALJ then presented the following hypothetical to the VE:

> Let's assume that we have an individual that's early 50s. They have a high school equivalency education, two years of college. They['ve] got the same work history as you've just described. They really don't have any physical restrictions, but they do have some non-exertional limitations. But . . . this hypothetical individual should be able to perform work [where] interpersonal contact is routine, but superficial.

Complexity of the tasks is learned by experience. Several variables. They can use judgment with limits. The supervision required is little for routine, but detailed for non-routine.

Based on this hypothetical, the ALJ asked the VE whether this "hypothetical individual" would be able to work as a cashier, substitute teacher, or assembly line worker. The VE responded that this individual would be able to work as a cashier and assembly line worker but not as a substitute teacher.

The ALJ evaluated Brown's disability claim according to the five-step process outlined by the Social Security regulations. *See* 20 C.F.R. § 404.1520(a)–(f). In his decision, the ALJ concluded that Brown had not engaged in substantial gainful activity since the onset of her alleged disability on July 28, 2004, although she had worked part-time as a substitute teacher. He also found that the medical evidence established that Brown suffers from a depressive disorder and an anxiety disorder but that Brown did not have an impairment that met the requirements of any listed impairments. He also found that Brown's subjective allegations were "not borne out by the overall record" and concluded that such allegations were "not to be fully credible to the extent alleged." According to the ALJ, Brown had the residual functional capacity (RFC) to perform work-related activities at the semi-skilled level with no exertional limitations. The ALJ determined, based on the VE's testimony, that Brown could perform her past relevant work as an assembly worker and cashier because both jobs were categorized as light and either unskilled or semi-skilled. The ALJ's ultimate conclusion was that Brown was not "disabled" under the Social Security Act.

In reaching his decision, the ALJ rejected Dr. Conner's opinion that Brown was "not able to return to work now or in the future." Although he acknowledged that "great weight must be given to this opinion by reason of the position as the claimant's primary care physician," he noted that "opinions or conclusions by a treating or

examining physician that a claimant is 'unable to work' or 'disabled' are not binding" because "whether a given claimant meets the definition of disability rests by law with the [ALJ] who is charged with the duty of conducting an independent evaluation of the signs and symptoms which led the doctor to his conclusion." Additionally, the ALJ rejected Dr. Conner's opinion because "he is the claimant's primary care physician and has not had specialized training in treating and diagnosing mental impairments like Dr. Morgan, the claimant's treating psychiatrist." Furthermore, the ALJ found that Dr. Conner's opinion was contrary to Dr. Morgan's opinion.

Brown filed a request for review, which the Appeals Council denied. Thereafter, Brown sought judicial review of the ALJ's decision in district court. The district court concluded that the ALJ's decision was supported by substantial evidence and affirmed the ALJ's decision.

## II. *Discussion*

On appeal, Brown argues that she is unable to work due to her long history of mental illness. She notes that she has been hospitalized on several occasions because of her illness, including a psychotic episode in June 2006 during which she exhibited a sudden onset of delusional, hallucinatory behavior. According to Brown, her treating primary care provider, Dr. Conner, opined that she is incapable of tolerating full-time employment due to her inability to deal with the stress and anxiety in normal daily activity. Brown maintains that the ALJ wrongly disregarded Dr. Conner's opinion and found that Brown's mental illness only limits her to semi-skilled work. Specifically, Brown acknowledges that the ALJ did not have to give Dr. Conner's opinion controlling weight but contends that he should have given the opinion some weight and found Brown more significantly limited by her mental impairments. Brown asserts that Dr. Conner's opinion should be afforded greater weight because it is based on his knowledge of Brown's diagnoses, his documentation of her history, her response to various medications that he prescribed, his observations during multiple face-to-face visits with her, and her treatment at various mental health facilities.

-14-

In response, the government argues that the ALJ's finding that Brown was not disabled was within the purview of the Act and consistent with regulatory criteria. The ALJ found that Brown had the severe impairments of a depressive disorder and an anxiety disorder but that her impairments did not render her disabled. According to the government, substantial evidence supports the ALJ's determination of Brown's RFC; additionally, the ALJ correctly weighed the medical evidence, including the medical records and opinions from Brown's treating physician, Dr. Conner, and Brown's treating psychiatrist, Dr. Morgan. The government argues that the ALJ properly rejected Dr. Conner's statement that Brown could not work because Dr. Conner opined in an area reserved for the Commissioner of the Social Security Administration. And, the government contends that Dr. Conner's opinion conflicted with Dr. Morgan's treatment notes, Dr. Conner's own treatment notes, and with Brown's account of her wide-range of activities.

> We review de novo a district court's decision affirming the denial of social security benefits. We will affirm if the Commissioner's decision is supported by the substantial evidence on the record as a whole. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. We consider both evidence that detracts from and evidence that supports the Commissioner's decision. If substantial evidence supports the decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome.

*McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (internal quotations, alteration, and citations omitted).

We recognize that "a treating physician's opinion is generally entitled to substantial weight"; however, such an "opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009) (internal quotations and citation omitted). "Moreover, an ALJ may credit other medical evaluations over that of the treating

-15-

physician when such other assessments are supported by better or more thorough medical evidence." *Id.* at 879 (internal quotations and citations omitted). When deciding "how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations." *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotations and citation omitted).

Here, the ALJ "rejected" Dr. Conner's opinion for three reasons: (1) Dr. Conner's opinion that Brown is unable to work usurps an issue that is exclusively within the ALJ's determination; (2) Dr. Conner, as the primary care physician, does not have specialized training in treating and diagnosing mental impairments like Dr. Morgan, the treating psychiatrist; and (3) Dr. Conner's opinion is contrary to Dr. Morgan's opinion.

### 1. *Dr. Conner's Opinion That Brown Is Unable To Work*
Dr. Conner, Brown's primary care physician, opined that Brown "is not able to tolerate full time employment" and "is not able to return to work now or in the future." The ALJ rejected Dr. Conner's opinion, in part, based on his conclusion that he was not bound by a treating physician's opinion on the ultimate issue—whether a claimant is "disabled."

Here, "[t]he ALJ correctly noted . . . that the ultimate conclusion of whether [Brown] could sustain gainful employment is a question for the Commissioner." *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(e)(1); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely 'opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'") (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir.

2002)). "A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (citing *Stormo*, 377 F.3d at 806); *see also Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991) ("Although Dr. Beaumier did state that in his opinion claimant could not be gainfully employed, such statements are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the Secretary.").

Nevertheless, Brown argues that the ALJ's conclusion is at odds with this court's decisions in *Cox v. Barnhart*, 345 F.3d 606 (8th Cir. 2003), and *Hatcher v. Barnhart*, 368 F.3d 1045 (8th Cir. 2004). In *Cox*, we concluded that the ALJ "improperly discounted the opinion of . . . [the claimant's] treating physician" when he found that the physician's opinion was conclusory and invaded the province of the Commissioner. *Cox*, 345 F.3d at 608. We noted that none of the ALJ's reasons for discounting the physician's opinion were "valid justifications for stripping [the physician's] opinion of all its weight." *Id*. In that case, the physician opined that the claimant was "not able to be gainfully employed" at that time. *Id*. at 609. We acknowledged that the ALJ was correct in stating that "conclusory statements by a doctor, if unsupported by the medical record, do not bind the ALJ in his disability determination" and that "[if] [the physician's] letter were the only available record from [the physician], [then] the ALJ would have been correct in giving it little weight due to its conclusory nature." *Id*. at 608, 609. But the letter was "only one part of a larger medical record supplied [by the physician] and [the claimant's] other treating physicians." *Id*. at 609. According to the court, "[v]iewed in context of her medical record, [the physician's] letter is a culmination of the numerous visits [the claimant] had with her past doctors, and his experience with treating her chronic pain." *Id*.; *see also Hatcher*, 368 F.3d at 1047 ("The instant matter is almost indistinguishable from *Cox*. Here, as in *Cox*, the treating physician opined that [the claimant] was unable to work. As in *Cox*, all of the treatment notes support [the claimant's] complaints and her

claimed limitations. As in *Cox*, there is nothing in the record that contradicts [the claimant's] physician's opinion aside from the opinion of the ALJ-appointed expert.").

But *Cox* and *Hatcher* are distinguishable from the present case because the "larger medical record" does not support Dr. Conner's conclusory opinion. Here, Dr. Conner opined on August 25, 2007, that Brown was unable to work even though he had not been the primary doctor treating her for her anxiety since her entry into Lakeside in June 2006. Although Dr. Conner did see Brown in July 2006, it was a "follow-up" appointment following her discharge from Lakeside in which Dr. Conner actually *denied* that Brown had any significant anxiety. Specifically, he noted that Brown had "no significant anxiety" and "no obvious psychotic behavior." He found her "much improved." Additionally, even though Brown saw Dr. Conner periodically from August to November 2006, she was seeing him for medical conditions unrelated to anxiety, depression, or psychosis.

### 2. *Dr. Conner's Lack of Specialization in Treating and Diagnosing Mental Illness*

The ALJ's second reason for discounting Dr. Conner's opinion was that Dr. Conner "is the claimant's primary care physician and has not had specialized training in treating and diagnosing mental impairments like Dr. Morgan, the claimant's treating psychiatrist."

"Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist." *Thomas v. Barnhart*, 130 F. App'x 62, 64 (8th Cir. 2005) (unpublished per curiam) (citing 20 CFR §§ 404.1527(d)(5); 416.927(d)(5); *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)); *see also Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) ("More importantly, although a treating physician's opinion is considered to be significant, specialists' opinions are generally afforded more weight.").

-18-

In *Hinchey*, the claimant argued that the ALJ should have given more credit to her family practitioner, who was more familiar with her conditions, instead of giving greater weight to the opinion of a specialist in cardiology. 29 F.3d at 431. We rejected the claimant's argument, explaining:

> Given the fact that, at a minimum, [the cardiologist] is at least one of two treating physicians, the court committed no error in giving greater weight to his expertise. The Secretary's regulations for evaluating medical opinions specify, "We generally give greater weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5). We conclude that the ALJ committed no error in giving greater weight to the opinions of [the cardiologist] as the treating specialist in this case.

*Id*. at 432; *see also Hensley v. Barnhart*, 352 F.3d 353, 356 (8th Cir. 2003) (holding that, in finding that claimant could perform the full range of sedentary work, the ALJ properly discounted the opinions of two treating physicians and the claimant's subjective complaints of pain because the physicians' opinions tended to conflict with that of a specialist, whose observations as to the claimant's mobility tended to agree with the claimant's admission that he cared for his sister and two children and with the fact that few functional limitations were placed on the claimant by the other doctors).

Here, as in *Hinchey*, the ALJ committed no error in giving greater weight to Dr. Morgan's expertise, as he is a specialist in mental health and functioned as a treating physician to Brown.

### 3. *Conflicting Opinions of Dr. Conner and Dr. Morgan*

The ALJ specifically found that Dr. Conner's opinion was contrary to Dr. Morgan's opinion. We now address whether Dr. Morgan's opinion actually conflicted with that of Dr. Conner.

-19-

Brown argues that Dr. Conner's opinion is consistent with his own treatment notes, Dr. Morgan's opinion, and with other medical evidence in the record. In her reply brief, Brown asserts that the ALJ created inconsistencies between the opinions of Dr. Conner and Dr. Morgan by selecting evidence from Brown's "symptom-free periods," thereby ignoring this court's observation that "one characteristic of mental illness is the presence of occasional symptom-free periods," *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal quotations and citation omitted), and that "[e]vidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on mental disorder has ceased." *Vester v. Barnhart*, 416 F.3d 886, 892 (8th Cir. 2005) (Heaney, J., dissenting) (citing *Andler*, 100 F.3d at 1389).

We first address whether inconsistencies appear in Dr. Conner's own treatment notes. On July 28, 2006, after Brown's release from Lakeside for her admittedly one-time psychotic episode, Dr. Conner held a "follow-up" consultation with Brown, as Lakeside had directed. During that appointment—held 18 days after her discharge from Lakeside—Brown informed Dr. Conner that she was feeling much better and sleeping much better. Dr. Conner found no obvious psychotic behavior and stated that Brown was "much improved." Thereafter, Dr. Conner did not see Brown again for any *mental conditions*, such as anxiety, depression, and psychosis, prior to his April 27, 2007 letter. The record reflects that he was not her treating physician for her mental conditions after July 2006; instead, Dr. Morgan assumed the role of Brown's treating psychiatrist. Not until July 20, 2007—after the April 27, 2007 letter—did Brown report to Dr. Conner about her mental condition, stating that her medications were working well. Therefore, at the time that Dr. Conner wrote his opinion letter, he effectively had not treated Brown for her *anxiety, depression, or psychosis* in eight months. While Dr. Conner admitted in his letter that Brown "had been in relatively stable condition over the past few months," his conclusion that Brown's "continued problems she has with stress and anxiety in normal daily activities" meant that she could not "tolerate full time employment" was not based on a recent examination of

Brown for her mental illness. This lapse in time, coupled with his July 2006 notes that Brown exhibited "no significant anxiety" and "no obvious psychotic behavior," detracts from his 2007 conclusion that Brown could not work again.

We must next examine whether inconsistencies exist between the opinions of Dr. Conner and Dr. Morgan. From December 2006 to May 2007, Dr. Morgan consistently opined that Brown's mood was stable, she showed no signs of psychosis, and her thought processing was integrated. He reported that she was "less vulnerable to day to day stressors" and assigned her a GAF of either 65 or 70. Additionally, Dr. Morgan commented on Brown's daily activities, stating that she "works out fairly regularly," had a "family Christmas dinner at her home, and "is spending more time taking care of herself."

It is true that Dr. Morgan acknowledged on May 31, 2007, that Brown "had a severe episode of illness," just as Dr. Conner's letter acknowledged Brown's past psychotic episode. And, just as Dr. Conner recognized that Brown "has been in relatively stable condition over the past few months," so too did Dr. Morgan recognize that Brown "is reasonably stable." The opinions are consistent in this regard.

But the difference between the two opinions is that Dr. Conner was willing, despite not treating Brown for mental illness since July 2006, to conclude that because of Brown's *past* episode, Brown is no longer capable of working. By contrast, while Dr. Morgan did not explicitly state whether Brown was capable of working or identify any limitations on her ability to work, he did consistently assign her a GAF of 65 or 70. "[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'" *Kohler v. Astrue*, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000)). Thus, Dr. Morgan's conclusion that a GAF of 65 or 70

-21-

indicates only mild symptoms is inconsistent with Dr. Conner's conclusion that Brown suffers from such a severe limitation that she is no longer able to work. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) ("The ALJ found Dr. Okiishi's opinion that Goff suffered extreme limitations was starkly inconsistent with Dr. Okiishi's opinion in February 2001 that Goff's Global Assessment of Functioning (GAF) was 58. According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF of 51 to 60 indicates moderate symptoms. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). Thus, Goff's GAF is inconsistent with Dr. Okiishi's opinion that she suffers from extreme limitations.").

Furthermore, other evidence in the record detracts from Dr. Conner's opinion that Brown is unable to work. The record reflects that Brown's medications are effective. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (internal quotations and citation omitted). And, this is *not* a case in which Brown has suffered from repeat psychotic episodes that render her "significantly impaired" despite her use of medications; instead, Brown experienced a one-time psychotic episode. Her symptoms have since been effectively controlled by her medication. *Compare Hutsell v. Massanari*, 259 F.3d 707, 710, 712 (8th Cir. 2001) (noting doctor's assessment that although the claimant responded favorably to medication, she was "still significantly impaired and would have great difficulty obtaining and maintaining gainful employment" and concluding that while the claimant's "medication helps to control her condition," it "does not cure it or alleviate the possibility that [the claimant] will relapse or decompensate").

Additionally, Brown's daily activities, in conjunction with other record evidence, support the ALJ's finding that Brown is capable of performing light work. "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Goff*, 421 F.3d at 792. The ALJ cited to

testimony at the hearing that established Brown's daily activities, including "getting her daughter off to school, cleaning, cooking at times, going to workout at times, visiting her mother, going to church almost every Sunday; and Bible class some days." According to the ALJ, the record also reflected that Brown "takes care of her own personal needs, prepares meals three times a week, does the laundry, shops for groceries, drives, pays bills, and talks with others on the telephone a couple times a week." Brown is also involved in her daughter's school activities, visits her mother, and works out regularly, going to a workout center at least a couple of times per week.

### III. *Conclusion*

Because substantial evidence on the record as a whole supports the ALJ's conclusion that Brown is not disabled, we affirm the judgment of the district court.

_____