# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2975

_____

| | | |
|---|---|---|
| Rodney Alan Renstrom, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Michael J. Astrue, Commissioner of | * | |
| Social Security | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  May 17, 2012
Filed:  June 12, 2012

_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Rodney Renstrom sought disability insurance benefits for his ongoing back pain, lower extremity problems, neck pain, sleep apnea, and anxiety. An Administrative Law Judge (ALJ) upheld the Commissioner's denial of benefits after concluding Renstrom maintained the residual functional capacity (RFC) to perform light work. The district court[1] affirmed. After careful review, we conclude the Commissioner's decision was supported by substantial evidence, and we affirm.

_____

[1]The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

I

Renstrom was born on November 21, 1959. He has a high school education and previously worked as a hydraulics valve machinist from 1979 to 2002. In 1993, Renstrom sustained an on-the-job injury—an L4-L5 disc herniation with surgical intervention superimposed on a pre-existing underlying degenerative disc disease—resulting in worker's compensation payments from that point until 2006. Renstrom underwent physical therapy, medical examination and evaluation, pain medication, IV injections, and surgeries due to his injury. Renstrom filed an application for disability insurance benefits on November 15, 2006, claiming he had been disabled since September 13, 2002, as a result of ongoing back pain, lower extremity problems, neck pain, sleep apnea, and anxiety.

A.     Medical Evidence

On April 5, 2002, Renstrom participated in a sleep study, which resulted in a diagnosis of sleep apnea. Renstrom was consequently fitted for the use of a CPAP monitor.

From May 2002 through January 2006, Renstrom saw Dr. James Schwender for his back pain. In October 2002, Dr. Schwender diagnosed Renstrom with degenerative disc disease at L5-S1. Dr. Schwender ordered further studies to determine the cause of Renstrom's pain and restricted Renstrom to no work from October 9, 2002, through December 31, 2002. In January 2003, Dr. Schwender assessed Renstrom as having discogenic back pain, with disc degeneration at L5-S1 confirmed through MRI results.

Renstrom returned to see Dr. Schwender in July 2003 with complaints of worsening symptoms. As a result, Dr. Schwender performed a minimally invasive spinal fusion at L5-S1 on Renstrom on August 25, 2003. On September 9, 2003,

Renstrom reported deep sharp pain radiating into his right hip, leg, knee, calf, and ankle, and was provided with an epidural steroid injection. However, Dr. Schwender noted satisfactory progress at Renstrom's post-operative visits in October and December, and Renstrom reported minimal pain at both visits. Dr. Schwender ordered a physical therapy regimen to allow Renstrom to return to work by early 2004, although he continued Renstrom's no-work restriction through January 31, 2004. The work restrictions were later continued until March 31, 2004. In March 2004, Renstrom reported he was "overall doing quite well" and his "back pain [was] essentially resolved," although Dr. Schwender described some occasional swelling and L5-type symptoms on Renstrom's right side.

On June 23, 2004, Renstrom complained of symptoms into his right lower extremity, although Dr. Schwender noted he had good strength without motor deficits and he was able to return to work on that date with lifting and motion restrictions. Renstrom was assessed as having ongoing symptoms, with improved low back pain but symptoms into the right lower extremity. Renstrom underwent a right-sided lumbar nerve root injection at L5 on that date.

On July 20, 2004, Renstrom underwent an independent medical examination with Dr. Loren Vorlicky, at the request of his employer's worker's compensation insurance carrier. Renstrom reported a decrease in low back pain, but the development of right leg pain. Dr. Vorlicky manipulated Renstrom's spine, and opined that Renstrom required work restrictions due to his surgery, although his MRI results did not show any ongoing nerve root impingement.

On September 15, 2004, Renstrom described improvements in his back and leg symptoms in a follow-up exam with Dr. Schwender, but also a flare-up of some pain after he had seen Dr. Vorlicky. Dr. Schwender diagnosed Renstrom with neuritis or radiculitis thoracic or lumbar, and ordered four more weeks of physical therapy. Once

again, Dr. Schwender noted Renstrom was able to work with restrictions from September 30, 2004, to December 31, 2004.

On April 20, 2005, Renstrom complained of worsening back pain, particularly on his right side, with symptoms into his right lower extremity into the buttocks, thigh, and calf. After being presented with various options, Renstrom wished to consider removal of the surgical instrumentation and a revision decompression. Dr. Schwender also ordered additional physical therapy and reinstated a no-work restriction from June 24, 2005, through July 31, 2005.

On August 3, 2005, Renstrom reported continued back pain with occasional symptoms into his lower extremities. Dr. Schwender indicated the MRI showed mild disc degeneration of the L4-L5 level with central protrusion and mild foraminal stenosis at L5-S1. Renstrom agreed to proceed with surgery for instrumentation removal at L5-S1 and decompression, which was performed on August 8, 2005. Dr. Schwender again noted Renstrom was unable to work from July 31 through November 30, 2005.

Renstrom reported overall slow progress in a follow-up visit on October 12, 2005, although his strength was improving in the right lower extremity. Renstrom's no-work restriction was ultimately continued through January 31, 2006. On January 11, 2006, Renstrom reported continued back pain and right lower extremity pain. Dr. Schwender diagnosed Renstrom with spinal stenosis of the lumbar region and referred him to Dr. Mark Agre for further back pain treatment.

In addition to overseeing Renstrom's physical therapy, Dr. Agre authored several documents for Renstrom, including an October 2006 worker's compensation letter stating Renstrom was "for all practical purposes, permanently totally disabled." The letter stated Renstrom was "able to do sporadic, light, intermittent, part time work with frequent position change, but the nature of the severity of his pain, particularly

the neuropathic pain of his right leg which has been unremitting to surgery, intervention or therapy, will not allow him to work beyond sporadic and light." Dr. Agre also completed some medical assessment forms wherein he opined that Renstrom was capable of light work with some restrictions; the second form he completed in January 2009 noted Renstrom could sit for two to four hours a day and regularly work four to six hours per day.

On November 6, 2006, Renstrom saw Dr. Patricia Kline for his neck pain. An MRI revealed Renstrom's vertebrae were intact and in normal alignment with some spurring, but he had no other appreciable abnormalities. Renstrom reported continued neck pain at future appointments on June 14, 2007, and July 29, 2008; on the latter date, Dr. Paul Westling noted Renstrom's neck pain was exacerbated by movement, and he prescribed prednisone and Flexeril and physical therapy. Renstrom had another MRI on August 11, 2008, which showed mild to moderate degeneration at C5-6 and slight changes with underlying disc degeneration at T6-7.

Renstrom also saw Dr. Westling and Dr. Randall Chadwick for shoulder problems beginning in 2005. After reports of pain, a June 7, 2005, MRI showed Renstrom's coracoacromial arch configuration would mildly increase his risk of impingement, but the exam was otherwise negative. Dr. Chadwick diagnosed Renstrom with left shoulder chronic impingement on June 22, 2005, for which Renstrom underwent two physical therapy sessions. Renstrom returned on October 9, 2005, when he reported intermittent soreness and nighttime discomfort with his shoulder, and Dr. Chadwick reiterated a finding of a mildly positive impingement sign. Renstrom received a cortisone shot and additional physical therapy sessions.

On January 31, 2007, a state agency reviewing physician, Dr. Gregory Salmi, conducted an assessment of Renstrom, concluding Renstrom could occasionally lift twenty pounds and frequently carry ten pounds, and he could stand, walk, or sit for six hours in an eight-hour work day. Dr. Salmi further opined Renstrom could

occasionally climb, bend, balance, stoop, kneel, crouch, and crawl, but his reaching was restricted. Dr. Salmi prohibited Renstrom from frequent bilateral overhead reaching and throwing due to his neck and shoulder problems.

## B. Renstrom's Claim for Benefits

Renstrom's application was initially denied on February 1, 2007, and again after reconsideration on March 30, 2007. In a hearing before the ALJ, Renstrom testified he had last worked as a machinist in 2000 or 2001, and had stopped working because of his back and neck pain. Renstrom indicated he was only able to walk for fifteen minutes, and stand and sit for ten to fifteen minutes at a time, with assistance in his car from a TENS unit. He stated he was prescribed a cane to assist with walking, but he was able to walk without it. Renstrom also noted the most he lifted was ten pounds, and he could not raise his left arm overhead. He testified he had bad headaches lasting all day, and he spent a lot of time in home therapy for his neck. Combined with his physical limitations, Renstrom stated the time he spent laying down prevented him from performing a job where he could change positions. On a typical day, Renstrom indicated he showered, ate breakfast, drove himself to therapy or performed therapy at home, and cared for his personal needs.

The ALJ also heard testimony from a medical expert, Dr. Andrew Steiner, who concluded Renstrom was not subject to any impairment that met the listings. Dr. Steiner discussed work-related limitations Renstrom would be subject to, pointing toward a "light" RFC with respect to lifting twenty pounds occasionally, ten pounds frequently, and being on his feet six out of eight hours in a work day with a brief position change hourly. Dr. Steiner also noted there were no neurological symptoms or signs in the record to document a foot drop.

Finally, a vocational expert, Steven Bosch, testified in response to hypothetical questions posed by the ALJ. Considering an individual impaired by a number of

conditions such as anxiety disorder, blurred vision, degenerative disc disease in the cervical, thoracic and lumbar spine, fusion in the lumbar spine, bilateral shoulder impingement, obstructive sleep apnea, and allegations of pain and fatigue, with the above restrictions and education and work experience similar to Renstrom, Bosch opined an individual would be unable to perform Renstrom's past work, but would be able to perform other jobs existing in the national economy such as bench assembler and parking attendant. Considering an individual with the same restrictions who was limited to sedentary work, Bosch indicated a person could serve as a security monitor, or perform assembly work. If the person was unable to use his hands for handling for up to four hours, had difficulty seeing for up to two hours, or would miss work once a week or more, Bosch testified such restrictions would not be consistent with competitive work. Moreover, Bosch stated a requirement of a position change and walking every fifteen minutes would eliminate a person's ability to perform most jobs, as would the need to lie down for an hour or more each day.

The ALJ ultimately denied Renstrom's application. First, the ALJ found Renstrom had the following impairments: (1) degenerative disc disease of the lumbar spine with past L5-S1 fusion and subsequent instrument removal and revision and decompression; (2) degenerative disc disease of the cervical and thoracic spine; (3) bilateral shoulder impingement; (4) obstructive sleep apnea; and (5) anxiety. After concluding these impairments were not severe enough to meet any listed impairment, the ALJ found Renstrom had the RFC to perform light work, with the additional requirement of a brief change of position after one hour. Moreover, the ALJ found Renstrom was restricted from overhead work, frequent reaching beyond eighteen inches, frequent bending and twisting, and skilled work. Accordingly, the ALJ found Renstrom was unable to perform his past relevant work as a machinist. However, the ALJ concluded Renstrom's account of the intensity, persistence, and functionally limiting effects of pain was not consistent with the objective medical evidence, and Renstrom could control the severity of his symptoms through prescription medications and other treatment options. Giving significant weight to the testimony of Dr. Steiner,

and little weight to Dr. Agre's opinion, the ALJ concluded Renstrom was not disabled because he could perform a significant number of other light and sedentary jobs in the national economy.

Renstrom's appeal to the Appeals Council was denied, making the ALJ's determination the final decision of the Commissioner. Renstrom thereafter appealed to the district court, which affirmed after concluding substantial evidence on the record as a whole supported the ALJ's decision. Renstrom now appeals to this court.

II

"We review de novo the District Court's determination of whether substantial evidence on the record as a whole supports the ALJ's decision." Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006). Substantial evidence "is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." Moore v. Astrue, 572 F.3d 520, 522 (8th Cir. 2009) (internal quotation marks and citation omitted). We consider "both evidence that supports and evidence that detracts from the Commissioner's decision," Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (internal quotation marks and citation omitted), but "[w]e do not reweigh the evidence presented to the ALJ, and we defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Gonzales, 465 F.3d at 894 (internal quotation marks and citation omitted).

Renstrom argues the ALJ's determination is not supported by substantial evidence because the ALJ improperly determined his RFC by rejecting the opinions of his long-term physician, improperly discounted the credibility of his subjective complaints, erroneously relied on the vocational expert, and improperly determined that he engaged in substantial gainful activity.

A.     The ALJ's RFC Determination

In her determination, the ALJ stated she gave significant weight to Dr. Steiner's opinion, which was supported by the record.  The ALJ indicated Dr. Steiner's opinion was "generally consistent" with the opinions of Dr. Schwender and Dr. Vorlicky. However, while the ALJ noted she considered Dr. Agre's opinion, she stated she did not give that opinion controlling weight because it was largely based on Renstrom's subjective allegations of pain, which the ALJ found not to be fully credible, and not supported by objective evidence.  Specifically, the ALJ concluded that despite Renstrom's "allegations of leg weakness and foot drop, physical examinations consistently demonstrate normal strength, no associated neurological loss, no objective findings to support the loss of propioception reported by Dr. Agre, and the claimant demonstrates the ability to use foot controls based on his reported ability to drive."

On appeal, Renstrom contends the RFC determination was incorrect because the ALJ failed to properly weigh the opinions of his treating physicians, Dr. Schwender and Dr. Agre, and discount the opinions of the Social Security medical experts.  Renstrom further asserts Dr. Schwender's opinion was not consistent with Dr. Steiner's, and the ALJ provided no specific basis to show otherwise.  Moreover, Renstrom challenges the ALJ's reliance on Dr. Vorlicky's opinion, who only saw Renstrom twice—once in 2004 and once in 2006.

Generally, "[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011) (internal quotation marks and citation omitted). However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Id. (internal quotation marks and citation omitted). "An ALJ may discount or even disregard the opinion of a treating physician

where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. at 897-98 (internal quotation marks and citation omitted).

After careful review, we conclude the ALJ properly decided to give Dr. Agre's opinion non-controlling weight. First, the ALJ noted Dr. Agre's opinion was largely based on Renstrom's subjective complaints. See Teague v. Astrue, 638 F.3d 611, 616 (8th Cir. 2011) (concluding the ALJ properly discounted a doctor's report, in part, because it "cited only limitations based on [the claimant's] subjective complaints, not his own objective findings"). Second, the ALJ found Dr. Agre's opinion was not consistent with the other medical experts, who determined Renstrom could perform light work within a modified RFC. "Because [Dr. Agre's] determination contradicted other objective evidence in the record, the ALJ's decision to give less weight to [Dr. Agre's] determination was reasonable." Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011). See also Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) ("[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.") (internal quotation marks and citation omitted); Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) ("The ALJ noted the conflicting opinions regarding [the claimant's] ability to perform work activities and chose not to give controlling weight to [the treating psychiatrist's] opinion.").

Finally, Dr. Agre's finding that Renstrom was "totally disabled" "gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." Perkins, 648 F.3d at 898. Accordingly, "the ALJ was permitted to disregard [Dr. Agre's] conclusory statement, unsupported by the objective medical evidence, that [Renstrom] is disabled." Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006).

As for Dr. Schwender's opinion, we agree with the district court that the ALJ only mentioned this particular opinion in passing by noting Dr. Schwender's opinion was generally consistent with the other medical experts. Nonetheless, while the ALJ was required to develop the record fully, she was not required to provide an in-depth analysis on each piece of evidence. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). This is particularly true here, because the ALJ found Dr. Schwender's opinion to be generally consistent with the other medical experts—who the ALJ did discuss in more depth. Like the other experts, Dr. Schwender's notes indicate Renstrom was improving with treatment, and that he could work with lifting restrictions, position changes, occasional reaching overhead and bending and twisting, and occasional kneeling, squatting, and climbing.

In sum, "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). While it may have been more preferable for the ALJ to discuss Dr. Schwender's opinion in more depth, there is substantial evidence in the record supporting the ALJ's finding because four out of five medical sources were consistent with the ALJ's RFC finding for a restricted range of light work. Therefore, we affirm the ALJ's determination with respect to the medical experts.

B.     The ALJ's Credibility Determination

Next, Renstrom contends the ALJ improperly found his subjective complaints not credible. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (internal quotation marks and citation omitted). In Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), this court set forth a number of factors an ALJ must consider in assessing a claimant's credibility:

"(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Moore, 572 F.3d 524. "When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors." Dipple v. Astrue, 601 F.3d 833, 837 (8th Cir. 2010). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Wiese v. Astrue, 552 F.3d 728, 733 (8th Cir. 2009).

In this case, the ALJ concluded Renstrom's impairments could be expected to cause the alleged symptoms, but Renstrom's statements about the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. The ALJ found the severity of Renstrom's impairments was not consistent with the objective medical evidence in the record. Notably, the ALJ concluded "there have been no findings of neurological losses, no objective radicular findings such as hypoflexia or nerve specific muscle weakness, there was no documentation of EMG abnormalities, there was full shoulder range of motion during an examination in October 2006 and the treatment note indicates the claimant had been last seen for his shoulder a year earlier, indicating the condition did not require ongoing treatment." Moreover, the ALJ noted Renstrom's symptoms improved with treatment, and thus, despite Renstrom's allegations of disabling levels of pain, the record showed he could use treatment to control the severity of the symptoms.

The ALJ also discussed the inconsistencies between Renstrom's allegations as it pertained to his anxiety and his daily living. After reciting the various activities Renstrom performed, the ALJ concluded the activities were consistent with the ability

-12-

to work within the RFC and did not support a disability finding. Finally, the ALJ found there was not a strong motivation for Renstrom to return to the workplace because he was involved in worker's compensation litigation, and while this was pending, he did not receive any vocational or rehabilitation services to assist with employment.

On appeal, Renstrom contends the ALJ could not reject his claims regarding pain, symptoms, or the effects of symptoms on his ability to work based solely on the lack of objective medical evidence. Renstrom also argues the fact that he could perform some chores and limited activities was not sufficient to discredit his subjective complaints of pain. Indeed, Renstrom asserts he testified he experiences pain daily, which affects his ability to walk and stand, among other things.

We reject Renstrom's arguments because the record shows the ALJ considered a multitude of factors in assessing Renstrom's credibility. First, the ALJ noted the severity of Renstrom's reported impairments was not consistent with the medical evidence in the record and his course of treatment. See, e.g., Teague, 638 F.3d at 615 ("Given that none of [the claimant's] doctors reported functional or work related limitations due to her headaches, there was a basis to question [the claimant's] credibility."). The ALJ proceeded to discuss how Renstrom improved with treatment, including physical therapy, a TENS unit, and pain medications, which showed Renstrom's level of pain was controllable. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (internal quotation marks and citation omitted). The ALJ also cited Renstrom's failure to obtain treatment for certain symptoms and for certain periods of time.

Next, the ALJ considered Renstrom's daily activities, including his multiple vacations, daily chores, and ability to provide self care. The ALJ found these activities indicated a lesser impairment than Renstrom claimed in his testimony. "We

-13-

have held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Halverson, 600 F.3d at 932 (internal quotation marks and citation omitted). Finally, the ALJ discussed Renstrom's work history, finding Renstrom had a possible disincentive to return to work because of his worker's compensation litigation. Together, these inconsistencies in the record as a whole undermined the credibility of Renstrom's allegations.

In sum, the ALJ discussed many Polaski factors in discrediting Renstrom's credibility in a detailed and prolonged discussion. "The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints." Partee, 638 F.3d at 865 (internal quotation marks and citation omitted). Because the ALJ gave good reasons for discounting Renstrom's credibility, we defer to the ALJ's credibility findings. See Perkins, 648 F.3d at 900 ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.") (internal quotation marks and citation omitted); Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009) (concluding the ALJ properly discredited the claimant's testimony after considering his own statements and his physicians' opinions that his pain was controlled with medication; the claimant maintained work after his onset date; and the claimant performed daily activities and chores that were inconsistent with his complaints of pain).

C.    The ALJ's Reliance on the Vocational Expert

Next, Renstrom contends the ALJ failed to incorporate all limitations, restrictions, and subjective complaints into the hypothetical posed to the vocational expert. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete

consequences of those impairments." Jones v. Astrue, 619 F.3d 963, 972 (8th Cir. 2010) (internal quotation marks and citation omitted).

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Martise, 641 F.3d at 927 (internal quotation marks and citation omitted). As noted above, the ALJ properly discounted Renstrom's subjective complaints and allocated more weight to certain medical opinions than others. Accordingly, the hypothetical question to the vocational expert did not need to incorporate the additional limitations the ALJ had properly disregarded. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."). "Based on our previous conclusion . . . that the ALJ's findings of [Renstrom's] RFC are supported by substantial evidence, we hold that the hypothetical question was therefore proper, and the [vocational expert's] answer constituted substantial evidence supporting the Commissioner's denial of benefits." Martise, 641 F.3d at 927 (internal quotation marks and citation omitted).

D.    The ALJ's Determination of Substantial Gainful Activity

Finally, Renstrom challenges the ALJ's determination that he engaged in substantial gainful activity after September 13, 2002. Citing documents indicating Renstrom earned $24,002.09 in 2002, and $12,330.00 in 2003, the ALJ stated there was no indication this work was not substantial gainful activity, and thus the ALJ concluded Renstrom engaged in substantial gainful activity through 2003. Renstrom claims these earnings were not as a result of work activity, but were from a retirement source and worker's compensation benefits. Therefore, Renstrom asserts these earnings cannot be considered for purposes of determining whether he engaged in substantial gainful activity.

We need not decide whether Renstrom engaged in substantial gainful activity in 2002 and 2003 because the ALJ found Renstrom "was not under a disability . . . *at any time from September 13, 2002, the alleged onset date, through December 31, 2008*, the date last insured[.]" Therefore, any error regarding Renstrom's substantial gainful activity was harmless, because the ALJ explicitly found Renstrom was not disabled from his alleged onset date through the date he was last insured—including the challenged 2002 and 2003 time periods. See Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently . . . and any error by the ALJ was therefore harmless.").

## III

We conclude substantial evidence in the record as a whole supported the ALJ's denial of disability insurance benefits. Accordingly, we affirm.

_____