# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————————

No. 10-1124

———————————

Scott Johnson,                                    *
                                                  *
                 Appellant,                       *
                                                  *      Appeal from the United States
        v.                                        *      District Court for the
                                                  *      Eastern District of Arkansas.
Michael J. Astrue, Social Security                *
Commissioner,                                     *            [PUBLISHED]
                                                  *
                 Appellee.                        *

———————————

Submitted: September 22, 2010
Filed:  December 6, 2010

———————————

Before LOKEN, HANSEN, and BENTON, Circuit Judges.

———————————

HANSEN, Circuit Judge.

Scott Johnson appeals the district court's[1] affirmance of the Social Security Commissioner's denial of his claim for Supplemental Security Income (SSI).  After careful review, we affirm.

_____

[1]The Honorable H. David Young, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

I.

Scott Johnson is a 34-year-old male who suffers from anxiety and obsessive compulsive disorder and has borderline intellectual functioning. He graduated 49th from a high school graduating class of 140 students and attended a few college classes before dropping out. Johnson was diagnosed in October 1994 at age 18 with obsessive compulsive disorder, dysthmia, possible development disorders, and immature personality disorder. At age 19, a psychological examiner observed diagnostic impressions of an anxiety disorder and attention deficit hyperactivity disorder, and he reported a social and occupational functioning assessment score of 50, reflecting serious impairments in social, occupational, and school functioning. After suffering from auditory and visual hallucinations, Johnson was hospitalized at Charter Hospital in 1996. He continued to receive services from Charter Behavioral Health System through 1998. Johnson had nine sessions with psychologist Dr. Travis Tunnell, Ph.D., between May 1997 and December 1997. There are no medical records from those visits in the administrative record, but Dr. Tunnell wrote an undated letter (stamped "received" for "Disability Determination" on March 24, 2006), stating that he had seen Johnson for obsessive compulsive thoughts and behaviors with associated anxiety, and that if those diagnoses continued, he "suspect[ed]" Johnson would have difficulty performing in a work setting.

The record does not reflect medical records from 1998 through 2004,[2] when he began receiving treatment from Stuttgart Regional Clinic Network. Johnson was at that time diagnosed with obsessive compulsive disorder and anxiety, and he was placed on Zyprexa and Luvoxamine, which helped control his anxiety. Johnson received treatment for obsessive compulsive disorder from the Rice-Lewis Clinic from November 2004 through February 2006, and medical records indicated he was doing

---

[2]Johnson was a patient at Arkansas Rehabilitative Services at some point, but those records were not available.

well with medication. Johnson was treated at the Arkansas Psychiatric Clinic from October 2006 through May 2007 for generalized anxiety disorder, obsessive compulsive disorder, and depressive disorder.

At the request of a state agency, Johnson saw Dr. Barry S. McDonald, Ph.D., for a mental status examination on April 20, 2006. Dr. McDonald diagnosed Johnson with agoraphobia without panic, obsessive compulsive disorder, dyssomnia NOS, possible ETOH abuse, possible PDD NOS, and personality disorder NOS with obsessive-compulsive and passive-dependent traits predominating. Dr. McDonald estimated Johnson's IQ at 80 or above but did not perform IQ testing, noting that he missed the request for IQ testing in his notes. He stated however, that he would work the IQ testing in if it was warranted.

Johnson has a very supportive family, and he resides with his mother. The only job he has ever held is working in his father's law office to run errands and clean the office on a very limited basis, working two days a week for a few hours. Johnson's father testified that Johnson is not reliable, is notoriously late for work, and is easily distracted away from a task. His mother testified that Johnson's anxiety often keeps him from sleeping at night and that he has a hard time functioning in the mornings. According to his mother, the combination of Johnson's obsessive compulsive disorder and his anxiety make it difficult for him to function on his own. She makes up errands for him to run to keep him busy. Johnson drives, hunts and fishes with his father, plays golf, and follows Razorback sports.

Johnson filed an application for SSI on February 22, 2006. After his claim was denied by the Social Security Administration (SSA), an administrative law judge (ALJ) conducted an evidentiary hearing on November 1, 2007. The ALJ concluded that Johnson had a combination of impairments including an anxiety related disorder, personality disorder, attention deficit hyperactivity disorder, and borderline intellectual functioning that caused significant limitations in Johnson's ability to

perform basic work activities. The ALJ concluded that none of the impairments, individually or collectively, met a listed impairment and that Johnson had the residual functional capacity to perform simple unskilled and low semi-skilled work with concrete instructions and superficial contact with others. A vocational expert (VE) testified that with Johnson's limitations, he could perform jobs such as a material handler or a hand packer. The ALJ concluded that Johnson had not been under a disability as defined in the Social Security Act since the claimed on-set date of February 22, 2006, and denied his appeal. The Appeals Council denied Johnson's request for review, making the ALJ's decision the final decision of the Commissioner. The district court reviewed the entire record and determined that substantial evidence supported the ALJ's decision. Johnson now appeals the district court's decision.

## II.

We review the district court's decision *de novo*, applying the same standard applied by the district court. Kluesner v. Astrue, 607 F.3d 533, 536 (8th Cir. 2010). We will uphold the Commissioner's decision as long as "it is supported by substantial evidence on the record as a whole," which is less than a preponderance, but sufficient for reasonable minds to find it adequate to support the decision. Id. (internal marks omitted). Our job is not to reweigh the evidence, but to ensure that the Commissioner's decision is supported by substantial evidence in the record. See Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009). We therefore must affirm the denial of benefits even if the evidence supports inconsistent positions, as long as the evidence supports the Commissioner's position. Id.

In assessing Johnson's application, the ALJ applied the familiar five-step evaluation specified in the social security regulations. See 20 C.F.R. § 416.920(a)(4)(i)-(v). The ALJ concluded that Johnson had not engaged in any substantial gainful activity (step one), 20 C.F.R. § 416.920(b), had a severe combination of impairments, including an anxiety related disorder, personality

disorder, attention deficit hyperactivity disorder, and borderline intellectual functioning (step two), § 416.920(c), but that the impairments did not meet or equal any of the listed impairments (step three), § 416.920(d). The ALJ skipped step four since Johnson did not have any past relevant work. At step five, the ALJ determined that Johnson had the residual functional capacity to perform simple unskilled and low semi-skilled work with concrete instructions and superficial contact with others. The ALJ relied on the testimony of a VE that Johnson could perform work in the economy.

Johnson takes issue with the ALJ's conclusion at step three that his mental impairment did not meet Listing 12.05 for mental retardation. See 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05. The mental retardation listing "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Id. An individual meets this listing if, *inter alia*, he has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. § 12.05C. The ALJ rejected this listing because the examining doctor estimated Johnson's IQ at 80 or above, exceeding the listing requirements. Johnson counters with a performance IQ score of 69 that he received when he was 16 years old. The same test revealed a full scale IQ of 78 and a verbal IQ of 92. Johnson argues that the discrepancies in the IQ scores, coupled with the examining doctor's notation that Johnson's adaptive functioning was significantly limited in two areas, should have led the ALJ to recontact the examining doctor to perform a full IQ test instead of merely estimating it.

Johnson does not claim that the record demonstrates that he met Listing 12.05C; rather, he argues that the ALJ committed reversible error in failing to recontact Dr. McDonald and order that he administer an IQ test. "[S]ocial security hearings are non-adversarial," and an ALJ has a duty to fully develop the record, even when the claimant is represented by an attorney. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). An ALJ should recontact a treating or consulting physician if a critical issue

is undeveloped.  See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  However, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."  Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).

The only indication of a qualifying IQ score is the performance IQ score of 69 when Johnson was 16 years old.  The examining doctor at that time concluded that Johnson had below average to average intellectual ability and diagnosed him with a learning disability.  Johnson graduated in the top half of his high school class, taking regular classes and receiving A's and B's.  The low performance IQ score did not raise concerns of mental retardation at the time.  Further, as noted by the district court, Dr. McDonald stated that he would perform an IQ test if it was warranted.  After evaluating Johnson and estimating his IQ to be 80 or greater, the highest of the three ranges available on the evaluation form, it is apparent that Dr. McDonald did not believe an IQ test was warranted.  This conclusion is supported by  the extent of Johnson's daily activities, as well as his ability during Dr. McDonald's examination to accurately perform mathematical problems, to recite the names of several past United States presidents and current political figures, and discuss other current events.  The record of Johnson's IQ was sufficiently developed, and the ALJ did not commit reversible error by failing to request that Dr. McDonald administer an IQ test.

Johnson also takes issue with the ALJ's determination at step five that he can perform other work in the economy.  Johnson argues that the ALJ's hypothetical question posed to the VE did not accurately describe his impairments and their resulting limitations.  The ALJ described Johnson's residual functional capacity as capable of performing medium work except that he "experiences anxiety disorder; borderline intellectual functioning; attention deficit disorder; and personality disorder which appears to be controlled with medication."  (Add. at 5.)  The ALJ also concluded that Johnson "is able to perform simple unskilled and low-semi-skilled work; understand, follow, and remember concrete instructions; and maintain

superficial contact with supervisors, co-workers, and the general public to meet, greet, make change, and give simple instructions and directions." (Id.) He then asked the VE whether jobs existed for an individual with this residual functional capacity, as well as Johnson's age, education, and work experience, to which the VE responded that such an individual could work as a material handler or a hand packer, both jobs widely available in the state and national economies.

Johnson argues that his actual limitations are much more significant than the "meager" limitations identified by the ALJ in the hypothetical question. Our review of the record reveals that the most recent medical evidence supports the ALJ's limitations. Dr. McDonald noted that Johnson's agoraphobia and his obsessive compulsive disorder were in a fair to partial, possible lasting remission with appropriate medical management and strong social support. The ALJ accounted for Johnson's limited intellectual functioning by requiring concrete instructions and limiting the jobs to unskilled or low semi-skilled work. He accounted for Johnson's personality disorders and anxiety by requiring only superficial contact with supervisors, co-workers, and the general public. These limitations are supported by the evidence in the record that Johnson was able to make deliveries for his father and run errands for his mother. He interacted well with people he knew. The ALJ's limitations are further supported by the evaluations of the effects of Johnson's medications. Although he had problems with medications in the past, the most recent evaluations showed that Johnson was doing "fairly well" and had "kind of stabilized" after resuming use of Zyprexa (Admin. Tr. at 123, Feb. 13, 2006, Report of Dr. Morgan), and that his "[a]nxiety [was] much better" after changing his dosage to 100 mg of Luvox, (id. at 185, May 1, 2007, Report of Dr. Gannoe). Although Johnson's parents each testified that Johnson was unable to hold down a job, the medical evidence in the record supports the ALJ's decision to not fully credit Johnson's parents' accounts. In turn, the residual functional capacity finding employed in the hypothetical to the VE was acceptable, and the ALJ's finding based on the VE's response is supported by substantial evidence.

## III.

The district court's judgment is affirmed.

_____