# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3701

_____

Darryl Hurd,

    Plaintiff - Appellant,

v.

Michael J. Astrue, Commissioner
of Social Security,

    Defendant - Appellee.

* * * * * * * * * * *

Appeal from the United States
District Court for the
Eastern District of Missouri.

_____

Submitted: September 22, 2009
Filed: September 13, 2010

_____

Before RILEY,[1] Chief Judge, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Darryl Hurd appeals from the denial of his application for supplemental security income ("SSI") benefits based on an administrative law judge's ("ALJ") finding that he is not disabled. Hurd alleged his disability was due to paranoid schizophrenia, depression, back pain, and muscle spasms in both legs. His application was denied initially by the Commissioner and after a hearing by an administrative law judge. The

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

district court[2] affirmed the decision. Hurd argues that the Commissioner violated his procedural due process rights by failing to proffer a letter that the ALJ wrote to Hurd's doctor before denying him benefits, or in the alternative that the Commissioner's action violated agency regulations. We affirm.

I.

On November 18, 2005, Hurd filed an application for SSI benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383b, claiming that his disability began on October 24, 2005. The Commissioner denied his application on February 17, 2006. Hurd requested a hearing before an ALJ, which was held on February 22, 2007. Hurd testified at his administrative hearing. He was then forty years old and had received his General Equivalency Degree ("GED") some years after completing tenth grade. He was last employed in 1987 as a dishwasher. Hurd was incarcerated for about six years on a cocaine sales conviction and was released from prison in September 2005. He had not looked for work since his release. While incarcerated, Hurd completed a 180-day treatment program for cocaine dependence and alcohol abuse. A Missouri Department of Corrections physician who prescribed medication to Hurd for paranoid-type schizophrenia offered the opinion that Hurd was disabled and qualified for medical assistance.

After his release, Hurd began receiving counseling and psychiatric services at the Hopewell Center. He was seeing a psychiatrist twice a month for schizophrenia, and he participated in drug treatment and twelve-step programs. Since his first year in prison, Hurd has heard voices that he cannot identify but that call him names, tell him he is not good at various things, suggest he step in front of a bus, and urge him to get in fights so he can be sent back to prison. When Hurd tries to figure out who

---

[2]The Honorable Thomas C. Mummert, III, United States Magistrate Judge, by consent of the parties.

they are, the voices argue back and tell him to do as he is told. Although he takes medication, the voices have only lessened but have not gone away. This condition prevents him from being able to concentrate or focus on one thing at a time.

Hurd also testified that he experiences leg spasms from his knees to his hips that awaken him at night. These occur approximately twice a week. He has back pain that limits his ability to bend over, but a doctor has not performed diagnostic work to find the cause. The only treatment he has received for his back is pain medication. Hurd denied having other problems that would prevent him from working full time, and he assessed his ability to get along with people as "pretty good." He has no medical insurance and does not receive Medicaid benefits. Since getting out of prison, Hurd drinks approximately two beers a week and has not used drugs or alcohol to excess.

The medical evidence begins with a note from Dr. Deja Suthikant of the Missouri Department of Corrections. He stated that, based on his clinical findings, Hurd is disabled and qualified for medical assistance. The medical records also indicate that Hurd began receiving care at the Hopewell Center on March 26, 2006, because on a nearly daily basis he was experiencing an inability to concentrate, hearing voices, and seeing visions of shadows. He said that his mental illness dated back to 1966, but he had received no treatment for it until he was incarcerated in 1999. He was taking medication at the time of his release in 2005, and he continued to do so until it ran out. Hurd was diagnosed with schizophrenia and assigned a Global Assessment of Functioning ("GAF") score of 40. The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. Kluesner v. Astrue, 607 F.3d 533, 535 (8th Cir. 2010).

Hurd returned to the Hopewell Center in April for counseling, and the next month began seeing Dr. Rolf Krojanker, a psychiatrist. In his assessment session, Dr. Krojanker concurred with the diagnosis of schizophrenia, questioned whether Hurd

-3-

might have a low IQ, and assigned a GAF of 30. Dr. Krojanker prescribed three medications, and at his next visit Hurd reported that the medication kept him calm but had not silenced the voices. Similar notes exist from his subsequent visits.

Hurd made two emergency room visits in late 2006 and one in early 2007. The first was on November 1, when he complained of pain from a herniated disc. He returned on December 13 and on January 28, also with back pain. Each time, he received pain medications and was sent home.

On February 7, 2007, Dr. Krojanker completed two assessment forms in connection with Hurd's SSI application. He opined that Hurd's condition prevented him from working and that he would remain unable to work for at least twelve months from the time Dr. Krojanker began treating him. With respect to his opinions on Hurd's ability to do work-related activities on a day-to-day basis in a regular work setting, Dr. Krojanker marked "fair" for each area under "making occupational adjustments," "making performance adjustments," and "making personal social adjustments." He did not, however, complete the portion of the form that asked him to list his medical findings that supported his assessment. The ALJ thus wrote a letter to Dr. Krojanker "to determine whether additional information is readily available to clarify your report/medical source statement." The letter went on to point out how Dr. Krojanker's report was insufficient and stated that the additional information was required within ten days. The record contains no further report or reply of any kind from Dr. Krojanker.

The remaining records begin with visits Hurd made after he filed his application for benefits. On January 31, 2006, Hurd saw Dr. Elbert Cason at the request of the Social Security Administration. Dr. Cason performed a one-time physical examination relative to Hurd's lower back pain and muscle spasms in his legs and thighs. His clinical impression was simply that Hurd has chronic pain in his lower back and night leg cramps in both thighs. Dr. Cason evaluated Hurd's range of

motion and found his upper extremity strength to be normal. He also evaluated Hurd's lower extremity strength and found it to be normal. Hurd demonstrated good effort in both evaluations.

Hurd saw Dr. Georgia Jones for a mental exam on the same day, also at the request of the Social Security Administration. Dr. Jones diagnosed Hurd with psychotic disorder, cocaine dependence in long-term and full remission, and personality disorder. She assigned Hurd a GAF score of 75. A state agency psychologist reviewed the medical records and found that Hurd has a psychotic disorder but that his impairment was not severe. The psychologist further opined that Hurd's mental impairment would impose only mild limitations on his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence, or pace. She concluded that Hurd had no limitations that would keep him from work.

Hurd's application was denied by Social Security on February 17, 2006. The agency determined that, although Hurd was impaired, his condition did not severely restrict his ability to perform work-related activities. Hurd requested and received a hearing before an ALJ on February 22, 2007. The ALJ denied his application on March 28, 2007, and the Appeals Council denied his request for review, leaving the ALJ's decision as the final agency decision. Hurd filed an action in the district court seeking judicial review, and the district court affirmed the agency decision. This appeal followed.

II.

This court conducts a de novo review of the district court's denial of Social Security benefits to determine whether the Commissioner's decision is supported by substantial evidence in the record. Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006). Substantial evidence "is less than a preponderance, but is enough that a

reasonable mind would find it adequate to support the Commissioner's conclusion." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). We defer heavily to the findings and conclusions of the Social Security Administration. Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment," so long as the impairment lasts for at least twelve consecutive months. 42 U.S.C. § 1382c(a)(3)(A). The claimant must be unable to do his previous work and, given his age, education, and work experience, cannot perform any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B). The Commissioner employs the sequential five-step process set forth in the regulations to determine whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must demonstrate that he is not currently performing "substantial gainful activity." 20 C.F. R. § 416.920(b). The ALJ found that Hurd had not performed substantial gainful activity since at least October 24, 2005, and this finding is not disputed. The evidence then must show that the claimant has a severe impairment, defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The ALJ found that Hurd suffers from schizophrenia and, because he went on to consider the third step, the ALJ must have found the condition to be severe.

The third step in the sequential evaluation is to determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and meets the twelve-month durational requirement. 20 C.F.R. § 416.920(d). The ALJ concluded that Hurd does not have an impairment or combination of impairments listed in, or medically equal to, the listing. Before moving to step four, the ALJ must determine a claimant's residual functional capacity, which describes what the claimant can do despite limitations. The claimant has the

burden to prove his residual functional capacity. <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 556 (8th Cir. 2003). Here, the ALJ determined that Hurd could perform work at the medium level so long as the work was simple, task-oriented, and involved infrequent contact with others. Based on the testimony of a vocational expert, the ALJ concluded that Hurd could work as a cleaner and launderer, and that a significant number of these jobs existed in the state and national economies. The ALJ thus determined that Hurd was not disabled.

### III.

After the hearing was concluded, the ALJ sent a letter to Dr. Krojanker, Hurd's treating psychiatrist. Dr. Krojanker did not reply to the ALJ's request, and the ALJ ultimately rejected his opinion. Hurd argues that his procedural due process rights were violated when the ALJ failed to proffer the letter to Hurd before sending it to Dr. Krojanker. Hurd asserts that, had he known of the inquiry, he would have used "his opportunity to be heard at a meaningful time regarding the weight of Dr. Krojanker's opinions." The Commissioner agrees that disability claimants are entitled to procedural due process, but asserts that Hurd's rights were not violated.

"Procedural due process under the Fifth Amendment requires that disability claimants be provided a full and fair hearing." <u>Passmore v. Astrue</u>, 533 F.3d 658, 663 (8th Cir. 2008) (internal quotation omitted). Although we have not defined all that is required for a full and fair hearing, we have said that due process "does not afford social security claimants an absolute right to cross-examine individuals who submit a report." <u>Id.</u> at 665. Here, Hurd submitted Dr. Krojanker's written report but did not call him as a witness at the hearing. As the Magistrate Judge wrote:

> Dr. Krojanker treated [Hurd] four times for a total of one hour and fifty minutes. He did not begin treating him for seven months after his alleged onset date and four months after [Hurd] was evaluated by Dr. Jones. His treatment notes do not include any observations by him

supportive of [Hurd]'s claims; indeed, the only observation Dr. Krojanker makes is that [Hurd] was "pleasantly helpful, but confused at times." That portion of the questionnaire completed by Dr. Krojanker in February asking that he list his medical findings to support his opinion that [Hurd] was disabled was blank. Additionally, Dr. Krojanker's notes reflect poor compliance by [Hurd] with taking his medication and keeping his appointments.

Dr. Krojanker's report offered the opinion that Hurd was disabled, but his treatment notes do not reflect that he ever talked to Hurd about his ability to work. His opinion differed from that of the other examining physicians and of a state agency psychologist, yet Dr. Krojanker did not provide the medical findings that supported his assessment in spite of a specific request that he do so. The ALJ noted that Dr. Krojanker prepared his statement at the request of Hurd's attorney rather than in the course of treatment. Cumulatively, these reasons explain why the ALJ gave little weight to Dr. Krojanker's opinions. He was justified in doing so because Dr. Krojanker offered little more than a conclusory statement that was unsupported by medical evidence. See Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

The ALJ understandably sought additional information from Dr. Krojanker after he had received all the evidence, but Dr. Krojanker did not respond. In the absence of additional evidence and contrary to what Hurd now argues, there was nothing more he could have offered concerning the weight that the ALJ should have afforded Dr. Krojanker's opinion. Yet, Hurd asserts that, had he known what the ALJ was asking Dr. Krojanker, Hurd "could have ensured that the ALJ received the information that the ALJ deemed important." This comment is no more than speculation, as no evidence exists to suggest how Dr. Krojanker would have responded. We conclude that Hurd's due process rights were not violated.

Finally, Hurd argues in the alternative that the ALJ violated agency regulations for the receipt of evidence by failing to notify Hurd of his letter to Dr. Krojanker. His

argument is unavailing, as Dr. Krojanker failed to respond to the request for additional information, and therefore no post-hearing evidence was received.

Because the Commissioner's decision to deny benefits was supported by substantial evidence, we affirm.

_____