# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-2059

———————

Toni Martise,                                    *
                                                 *
       Appellant,                     *
                                                 *   Appeal from the United States
    v.                                 *   District Court for the
                                                 *   Eastern District of Missouri.
Michael J. Astrue, Commissioner                  *
of Social Security,                              *
                                                 *
       Appellee.                      *

———————

Submitted: January 13, 2011
Filed: June 6, 2011

———————

Before WOLLMAN, LOKEN, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

Toni L. Martise appeals the district court's[1] judgment upholding the Commissioner of Social Security's denial of her application for disability insurance benefits. Martise argues that this court should reverse the administrative law judge's (ALJ) denial of benefits because the ALJ (1) violated Martise's due process rights by failing to proffer a letter that he sent to Martise's treating psychiatrist prior to his decision denying benefits, (2) erroneously determined Martise's residual functional

---

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

capacity (RFC), (3) failed to develop the record regarding Martise's mental impairment, and (4) erred in his hypothetical question to the vocational expert (VE). We affirm.

## I. *Background*

Martise filed an application for disability benefits, alleging disability beginning December 31, 2003, due to "brain damage from an accident many years ago, anxiety, depression, memory problems, back pain, asthma, arm weakness, migraine headaches, [and] shoulder pain." After denial of her application, Martise requested a hearing before an ALJ.

### A. *Martise's Testimony*

During the administrative hearing, Martise testified that she was 43 years old and had graduated from high school while attending special education classes. According to Martise, she can only read at a second- or third-grade level. She previously worked as a mail clerk for eight to ten years. She testified that, as a mail clerk, she received the mail from the mailman and sorted and delivered mail to each recipient. She did not put postage on the mail or wait on people. Martise testified that she hurt her back by lifting heavy boxes while pregnant. According to Martise, when she informed her boss of her injury, he replied that if she could not do her job, "then we'll have to fire you." Martise continued working. Subsequently, she was placed on bed rest until she had her baby. She then returned to work and developed problems with her right and left arms.[2] Martise testified that she had to carry heavy boxes for long distances and began experiencing burning and shooting pain in her right arm down into her hand. She sought treatment and was later told that she needed surgery. Martise stated that she could not afford the surgery because she did not receive any

---

[2]Martise testified that she ultimately resigned from her position as a mail clerk. She could not recall when she quit the job or whether she collected unemployment after leaving.

money from her divorce from her first husband. With regard to her left arm, Martise testified that, because she was told not to use her right arm, she overused her left arm.

Martise also "ended up getting hurt on [her] elbows" while working as a mail clerk. She testified that she had surgery on her right elbow, but she could not recall the year or the name of the doctor who performed the surgery. According to Martise, she still has burning in her right elbow if she tries to lift her son and can only lift five pounds without symptoms. Martise stated that she experiences burning in her right elbow that lasts for "a day or two" and that she uses a brace on her right arm. Martise said that the burning sensation goes from her elbow to her ring and little fingers, but she denied numbness or tingling and having trouble holding on to objects. According to Martise, when she has problems with her elbow, she uses her brace once or twice a month, for a period of about a day or two. She also stated that she performs exercises.

Martise maintained that her left upper extremity is worse than her right. She testified that while she was going to have surgery, it was not performed due to a paperwork error. She stated that she experiences constant burning pain, numbness, and tingling in her left arm that radiates into her ring and little finger, reducing her grip strength. Martise explained that she avoids picking up things with her left hand because it affects her elbow and shoulder. She asserted that she could not raise her left arm above shoulder level because of pain and a popping sensation.

As to her back pain, Martise testified that if she turns the wrong way, she experiences a "bad pain in [her] lower back." This pain then "shoots down [her] right leg," resulting in bed rest for almost two weeks. Martise then has her niece help her go to the bathroom and shower. According to Martise, "the pain sometimes gets so severe that one time I fell in the bathtub." Although she initially had trouble remembering how often she experiences that type of back pain, she ultimately concluded that it occurs once every two months. She stated that lying in bed and

engaging in doctor-recommended exercises aids her condition. Martise testified that she does not take prescription pain medication for her back or for her arms; instead, she takes Advil.

According to Martise, she did not work from 1988 to 1995 because she was "having babies." Martise has five children, ranging in age from 25 to five years old. Her eldest child is mentally retarded, and three of her other children have disabilities. She lives with her husband, five children, and 19-year-old niece. Martise's niece helps her with the children.

Martise explained that she saw Dr. David Berland for migraine headaches and mental issues because she was having problems dealing with her disabled children and the "outside world." Martise could not recall how many times that she saw Dr. Berland or the dates of her treatment. She testified that Dr. Berland saw her and her children for group sessions.

According to Martise, she suffers from migraine headaches "every day," three to four times per day. She testified that she takes medication to both prevent and relieve migraines. She stated that although her medication relieves her symptoms for about two hours, she then "get[s] hit with another bad one." In addition to taking medication, she attempts to relieve her migraines by confining herself to a dark room and applying ice to her neck and temples.

Martise has trouble with asthma, and her breathing problems and coughing cracked her ribs. Martise testified that she now understands when to use her "breathing inhaler thing to try to stop my—breaking my ribs." According to Martise, she needs breathing treatments once or twice a week. Martise also testified that she was recently diagnosed with diverticulitis, which causes her to experience pain and bleeding.

When asked how she spends her day, Martise replied that, on that day, she had awoken early that morning but went back to sleep and then rose later to get her son up for school. Her niece then fed and dressed Martise's youngest child. She testified that she avoids driving. She denied cooking or cleaning, contending that she had not done household duties since she stopped working in early 2004. She stated that she did not get dressed every day. According to Martise, she has difficultly concentrating and cannot read. She also has trouble sleeping, explaining that she remains awake until two or three in the morning, just staring at the clock. She described her mental state as "worse than a depression" and testified that she often cries and feels lonely. She stated that she was "tired of trying to be normal."

## B. *Medical Records*

Prior to her alleged onset date, from May 26, 1994, to May 21, 2003, Martise saw Dr. Helene Aisenstat and Dr. Robert Aisenstat, family practitioners, for migraine headaches, asthma, sinusitis, nasal congestion, coughing, ear pain, left shoulder pain, trouble sleeping, feelings of hopelessness and helplessness, depression, and family distress. Martise was primarily seen by Dr. Helene Aisenstat.[3] On June 1, 1995, Martise's husband notified Dr. Aisenstat that Martise was behaving aggressively, packing her clothes to leave, and drinking alcohol. On June 1, 1998, Martise reported that Imitrex injections helped her migraines. Nine days later, Martise reported that, for the past two days, she had been unable to stop coughing and had decreased respiratory effort with wheezing. She was diagnosed with asthma and bronchitis. On September 3, 1998, Martise complained of severe pain in her rib cage, but an x-ray of her ribs was negative. Less than a year later, Martise reported that she had started wrestling, planned to wrestle professionally, and had been wrestling at a gym with no problems. On May 30, 2000, Martise reported that her depression was "out of control."

---

[3]References to "Dr. Aisenstat" in the remainder of this opinion refer to Dr. Helene Aisenstat.

In May and early June 2001, Martise received treatment at Missouri Baptist Medical Center for back pain while she was pregnant. A magnetic resonance imaging (MRI) examination of her lumbar spine revealed a "small central and right posterior lateral disc protrusion and herniation" at the L4-L5 level. She improved after bed rest and epidural steroid injections. At an examination following her discharge from the hospital, Martise reported improvement in her back pain and was advised to take Tylenol #3 for any extreme pain.

On September 27, 2002, Martise saw Dr. Aisenstat and reported that she had been coughing so much that she feared that she fractured a rib. Dr. Aisenstat diagnosed Martise with a rib fracture in the back of her ribcage.

Dr. David M. Brown examined Martise on January 21, 2004, in connection with a workers' compensation claim for right elbow pain. Dr. Brown had previously treated Martise in 2000 for this same condition, and Martise had responded to a course of conservative treatment, including multiple steroid injections, forearm bracing, medication, and work restrictions. Martise exacerbated her condition on December 31, 2003, when she was "pushing a banker box weight about 50 or 60" pounds. Martise reported that she was a smoker and had lung trouble.

Upon examination, Dr. Brown found that Martise was tender over her right elbow, but he found no swelling. Martise also had a "good" active range of motion. She reported tenderness over the right elbow and increased pain with resisted wrist extension. X-rays revealed no significant bone or joint abnormality. Dr. Brown diagnosed Martise with chronic right lateral epicondylitis, gave Martise a steroid injection, recommended that Martise wear a forearm brace and use a non-steroidal anti-inflammatory medication, provided work restrictions limiting Martise to lifting less than two pounds with the right arm and no repetitive activities with her right arm; and asked Martise to return in four weeks for a reevaluation.

On January 29, 2004, Martise saw Dr. Aisenstat with complaints of pain in her left elbow, wrist, and shoulder. Dr. Aisenstat diagnosed Martise with insomnia, depression, headache, and left upper extremity pain and advised Martise to return in three months.

At her reevaluation with Dr. Brown on February 16, 2004, Martise reported no improvement in her right elbow pain. Upon examination, Dr. Brown found that Martise had good active range of motion but that Martise was tender over the right elbow. Martise reported pain with wrist extension. Dr. Brown recommended surgical intervention, opining that Martise could work with a five-pound lifting limit and with no sustained repetitive activities preceding surgery.

Two days later, Martise returned to Dr. Brown, advising him that she could not work. She complained of burning pain in her right elbow with a shooting pain into her hand; stated that she could not brush her teeth with her right arm; reported having pain in her left elbow, shoulder, and neck; and stated that she could not go to the grocery store, clean house, or do dishes because of the pain. Dr. Brown asked Martise a series of questions to determine if she could perform any less physically demanding work for her employer, as Dr. Brown had received a facsimile from the employer's workers' compensation carrier listing various jobs available for Martise. Martise told Dr. Brown that she could not answer phones and take messages "because of some brain trauma she has had in the past and she cannot write messages." Martise also informed Dr. Brown that she could not sign for packages, load paper into a fax machine, or separate paper due to pain, but she could take printed messages off of a fax machine and notify the recipients that a fax was waiting. Upon examination, Martise appeared tearful, but Dr. Brown found no visible swelling, abnormality, or sympathetic changes in either extremity. She had diffuse tenderness in both arms and wrists, but testing for cubital tunnel or carpal tunnel syndrome was negative. When asked to give maximal effort on grip testing, Martise was unable to record any measurable grip strength. Dr. Brown noted that Martise's "subjective complaints have

expanded, are diffuse and are non-physiologic and do not correspond to any specific upper extremity diagnosis." He opined that Martise "does demonstrate evidence of symptoms magnification and poor effort on examination." Because Martise's "symptoms [were] so diffuse and severe," Dr. Brown "advise[d] against surgical intervention." He released Martise to "work as tolerated" and advised her to obtain a second opinion. There is no indication in the record that Martise ever obtained this second opinion.

The day after Martise saw Dr. Brown, she saw Dr. Aisenstat for a "check up on medications" and follow-up for headaches. Martise reported that her migraines were "getting out of control." A physical examination was normal. Two weeks later, on March 1, 2004, Martise called Dr. Aisenstat requesting medication for a sinus infection. Then, on May 4, 2004, Martise complained of sinus pain, migraines, sore throat, and congestion.

On June 24, 2004, Dr. Brown performed a right epicondylectomy.[4] Five weeks after surgery, Martise saw Dr. Brown for a follow-up appointment. At that appointment, Martise reported that she was "doing great." She had active range of motion of the elbow, with no tenderness or pain, and grip strengths of 55 pounds on the right and 75 pounds on the left. Dr. Brown advised her to continue her home therapy program, that she could work on full duty with no restrictions, and to return for a follow-up appointment in two months. When Martise returned on October 4, 2004, she reported that her right elbow was "much improved." She showed good active range of motion of her right elbow with no point tenderness and good

---

[4]"An epicondylectomy is the removal of an epicondyle, which is 'an eminence upon a bone, above its condyle,' which is 'a rounded projection on a bone.'" *Green v. Shinseki*, No. 09-0517, 2010 WL 2978502, at *1 n.1 (Vet. App. July 29, 2010) (unpublished) (quoting Dorland's Illustrated Medical Dictionary 408, 637 (31st ed. 2007)).

sensation. Additionally, she reported no pain with wrist extension, and her grip strength was 30 pounds on the right and 35 pounds on the left. Dr. Brown opined that Martise had done "very well" after surgery and that no further treatment was necessary. He released Martise to work with no restrictions.

On October 14, 2004, Martise called Dr. Aisenstat's office from California, reporting that she had been having anxiety attacks and requesting a prescription for Xanax.

On February 7, 2005, Martise saw Dr. Aisenstat for nasal congestion, cough, headache, sinus pressure, ear pain, shortness of breath, and wheezing. Martise advised Dr. Aisenstat that she was taking over-the-counter medication with little relief. Dr. Aisenstat assessed Martise with bronchitis, sinusitis, allergies, and asthma, and advised Martise to use steam treatments and take Tylenol or Ibuprofen as needed. Dr. Aisenstat also told Martise to "stop smoking."

One month later, Martise reported to Dr. Aisenstat that she was experiencing anxiety attacks and problems with her children. Dr. Aisenstat prescribed Toradol and referred Martise to Dr. Berland.

On March 9, 2005, Martise saw Dr. Berland for psychiatric evaluation. She advised Dr. Berland that her children were either physically or mentally ill: her 23-year-old son was mentally retarded and had birth defects, her 16-year-old son had been hospitalized at a state psychiatric hospital, her 14-year-old son had recently been discharged from an adolescent psychiatric unit, and her 13-year-old daughter had an unknown prognosis due to an illness. She said that she was involved in a serious car accident 20 years ago, causing her to have reading, writing, and spelling difficulties and an "anesthetized lower lip." She reported that she had been under extreme stress for the past ten days; on February 28, 2005, her 16-year-old son attempted to choke her, and he was placed in a psychiatric facility. She informed Dr. Berland that she was

taking Effexor, Trazodone, Neurontin, and Alprazelam. Martise told Dr. Berland that she quit her job in 2003 and took her younger daughter to California "in order for her to reach a dream." She "commuted a couple of times" before bringing the daughter back to St. Louis in May 2004. Thereafter, she traveled again with her daughter in August 2004 and returned to St. Louis in mid-November 2004.

During her clinical interview, Martise reported having no time to pursue any of her own interests. She felt hopeless and experienced crying spells. Her mood seemed depressed, and she was worried about her children and whether they would be able to live independently. She was oriented but unable to name the current or past presidents. She required prompting to recall four out of five items after a five-minute delay and could not recall them immediately without practice. She performed serial three's from 20 without error, could spell "world" correctly backward and forward, and exhibited concrete thinking.

Dr. Berland diagnosed Martise with adjustment disorder with depressed mood possible major depression; possible post-traumatic stress disorder; possible stress reaction; possible bipolar disorder; and reading, writing, and spelling disabilities. He assessed a Global Assessment of Functioning (GAF) score of 45[5] and prescribed Effexor, to reduce her hypertension, and Klonopin.

Martise returned to Dr. Berland on April 7, 2005, reporting that she was scheduled for a colonoscopy, her migraines were better under control, and her family problems persisted. On May 17, 2005, she reported to Dr. Berland that she was experiencing daily migraines, arguing with her husband, having crying spells, and having problems with her children. Dr. Berland noted that Martise was "doing

---

[5]"A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'" *Pate-Fires v. Astrue*, 564 F.3d 935, 938 n.2 (8th Cir. 2009) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Am. Psychiatric Ass'n 1994)).

physical labor—per sister in law." He recommended that Martise try Elavil. On May 31, 2005, Martise reported that Elavil was helping her migraines. At her next appointment on June 16, 2005, Martise advised Dr. Berland that she was "exhausted" after a custody hearing the previous week but that she felt "good," had no migraines, and had an "ok" energy level.

In August 2005, Martise saw Dr. Aisenstat on two occasions for rectal bleeding, increased stress, migraine headaches, and pain in her right knee. Martise reported taking asthma medication, which was helping her breathing.

On November 29, 2005, Martise saw Dr. Aisenstat for coughing and wheezing, and Dr. Aisenstat diagnosed Martise with sinusitis. That same day, Martise also saw Dr. Berland, reporting to him that she had not been able to see him because she did not have any money; according to Martise, the family was $95,000 in debt. She described being in a "black hole" and said that she wanted a "tiny stroke" to wipe away emotion and the ability to know what is occurring. Dr. Berland gave Martise samples of Zoloft for depression. At her next appointment on December 13, 2005, Martise told Dr. Berland that she was crying less and no longer dwelling on wanting a stroke. Dr. Berland gave her sample medication. At her January 24, 2006 appointment with Dr. Berland, Martise reported some improvement in mood, but she continued to report problems with her children. She reported that Topamax "really helps" with her migraines.

On February 7, 2006, James M. Spence, Ph.D., completed a Mental Residual Functional Capacity Assessment. He did not note any "marked" limitations. He noted "moderate" limitations in Martise's ability to understand, remember, and carry out simple instructions; sustain an ordinary routine without supervision; complete a normal work day and work week without interruptions from psychological symptoms; and get along with coworkers. In all other areas, Dr. Spence did not note any significant limitations.

That same day, Dr. Spence also completed a Psychiatric Review Technique form. He noted that Martise had organic mental disorders and anxiety-related disorders and opined that Martise had medically determinable impairments of self-reported brain damage following a car accident, resulting in difficulties reading, writing, and spelling; depression; and anxiety. Dr. Spence concluded that Martise had "moderate" limitations in her abilities to maintain social functioning, concentration, persistence and pace; "mild" restrictions in her activities of daily living; and no limitations related to episodes of decompensation. Dr. Spence indicated that he had reviewed Dr. Berland's records and noted that Martise had many stressors in her life that aggravate her condition. He pointed out that Martise was not always consistent with obtaining treatment due to financial difficulties. Dr. Spence partially credited Martise's report of her activities of daily living, noting that she prepared food for her children, spending five minutes to one hour doing so. Dr. Spence noted that Martise slept, cried, and stayed in her room most of the time with the lights off. According to Dr. Spence, the most recent medical evidence did not indicate that Martise's condition was as severe as she alleged. He cited her report of recent improvement and that her conditions improved with medication. He determined that Martise's medical records demonstrated that, with medication and continued treatment, Martise could perform simple tasks on a sustained basis, but she should work in a low-stress environment away from the public.

On April 24, 2006, Martise reported to Dr. Berland that one of her sons had moved out and that her marriage was good. She reported taking Zoloft and Topomax but not Elavil or Neurontin. She stated that her mood was "ok."

On July 19, 2006, Martise indicated to Dr. Aistenstat's staff that Topamax controlled her migraines, but she had run out while in Arkansas the week before, and her headaches returned. Martise "was doing well on medications" and "needed refills."

-12-

At her November 30, 2006 appointment with Dr. Berland, Martise reported that her husband had quit his job and her daughter was expelled from her second school. Martise had resumed smoking due to family stress. On February 20, 2007, Martise reported continued behavioral problems with her children. She reported a lot of stress.

In March 2007, Martise reported to Dr. Berland that her daughter was at the state psychiatric hospital. She said that she was experiencing migraine headaches, eye twitches, and shoulder spasms. Dr. Berland adjusted Martise's medications. On April 4, 2007, Martise told Dr. Berland that she was having a colonoscopy performed that Friday, was losing blood, and felt sleepy. She reported that her daughter was scheduled to be released from the psychiatric hospital. On April 16, 2007, Dr. Berland noted that Martise's metabolic panel test and thyroid were normal and that she was scheduled for a gastrointestinal follow-up appointment. Martise exhibited no other complaints.

On May 1, 2007, Dr. Berland completed a Mental Medical Source Statement (MSS), noting "marked" restrictions in Martise's ability to maintain reliability, attendance, and punctuality; complete a normal workday and work week; maintain attention and concentration; and perform at a consistent pace without an unreasonable number and length of rest periods. He opined that Martise had "moderate" restrictions in her ability to behave in an emotionally stable manner and had "mild" restrictions in her ability to cope with normal work stress, function independently, accept instructions and respond to criticism, understand and remember simple instructions, make simple work-related decisions, sustain an ordinary routine, and respond to changes in work setting. He concluded that Martise had no limitations in her ability to relate in social situations, interact with the public, maintain socially acceptable behavior, and work in coordination with others. Dr. Berland noted that Martise had not suffered from an episode of decompensation that lasted at least two weeks, and he did not find that Martise had a substantial loss in the ability to stick to a task; understand, remember, and carry out simple instructions; make work-related

-13-

judgments and decisions; respond appropriately to criticism; and deal with changes in a work setting. He assessed a GAF score of 55[6] and noted that her GAF score in the preceding year had been 40.

On May 15, 2007, the day of Martise's administrative hearing, the ALJ sent Dr. Berland a letter requesting additional information to clarify his MSS. The ALJ informed Dr. Berland that his report contained the following deficiencies: (1) it contained conflicts that could not be reconciled with the medical evidence of record, including Martise's GAF score; (2) it did not contain all the necessary information needed to assess the severity of Martise's impairments; (3) it did not appear to be based on medically acceptable clinical and laboratory diagnostic techniques; and (4) it did not adequately address what Martise could do despite her impairments. The ALJ requested that Dr. Berland "provide medical records, a new report, or a more detailed report to support" the MSS. Two days later, Dr. Berland responded that he had provided all the information in his chart to Martise's attorney and that he had no other documentation to offer. Dr. Berland sent a copy of this letter to Martise's attorney.

## C. *VE's Testimony*

At the administrative hearing, the ALJ asked Dr. Jeff Magrowski, a VE, to assume a hypothetical claimant of Martise's age and education who can understand, remember, and carry out at least simple instructions and non-detailed tasks and can perform work in a low-stress environment without public contact. Dr. Magrowski testified that this person could not return to the work that Martise testified to but could work as a mail clerk, a "light" job with 2,500 jobs available in the state economy and 10,000 jobs available in the national economy. He stated that Martise's

---

[6]"According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF of 51 to 60 indicates moderate symptoms." *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010).

former job differed from this "mail clerk" job because Martise's former job required her to deliver mail and lift large packages in excess of 20 pounds. The ALJ noted that the hypothetical contained no weight limit, and he asked how Martise's past relevant work differed from the "mail clerk" job that Dr. Magrowski referenced. Dr. Magrowski testified that Martise's former work seemed more complex because Martise had to perform activities other than sorting mail. He also stated that Martise could perform work as a laundry bagger, a job with 1,000 jobs available locally and over 100,000 jobs available nationally. Dr. Magrowski testified that this job had a Specific Vocational Preparation (SVP)[7] of one.

The ALJ then asked Dr. Magrowski to review the RFC assessment of Dr. Berland and opine whether a person with that RFC could perform any past relevant work. In response, Dr. Magrowski testified that a person with that RFC could not perform any of Martise's past relevant work and could not perform any work in the state or national economy.

## D. *ALJ's Decision*

The ALJ concluded that Martise had not met her burden of proving that she had not engaged in substantial gainful activity since December 31, 2003—the alleged onset date. The ALJ cited to Martise's earnings of $4,026.96 posted to her earnings record in 2004, with no explanation of the source of such earnings. The ALJ stated that he would, nevertheless, proceed with the sequential analysis.

The ALJ found that Martise had the severe impairments of depression and anxiety, but she did not have an impairment or combination of impairments that met

---

[7]"The SVP level listed for each occupation in the [Dictionary of Occupational Titles] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration . . . ." *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010).

-15-

or medically equaled a listed impairment. He determined that Martise was unable to perform her past relevant work as a mail clerk because that work required her to deliver mail and, thus, interact with the public. But he found that Martise retained the RFC to perform work requiring her to understand, remember, and carry out at least simple instructions and non-detailed tasks, provided that work involved a low-stress environment without public contact. In making this finding, the ALJ noted, *inter alia*, that Martise's lowest GAF score in 2007 was 40 and that her highest, most current, GAF score was 55. After citing *Polaski v. Hecker*, 739 F.2d 1320 (8th Cir. 1984), and noting all of the relevant factors therefrom, the ALJ discredited Martise's allegations of symptoms precluding all work.

In his decision, the ALJ acknowledged that he had sent a letter to Dr. Berland "requesting clarification of his statement." He noted Dr. Berland's response offered no additional documentation.

The ALJ determined that, considering Martise's age, education, work experience, her RFC, and the VE's testimony, Martise could perform other jobs, such as mail clerk and laundry bagger—jobs that existed in substantial numbers in the national economy. The ALJ found that Martise had not been under a "disability," as defined by the Social Security Act, at any time through the date of his decision.

## II. *Discussion*

On appeal, Martise argues that the ALJ (1) violated her due process rights by failing to proffer a letter that he sent to Martise's treating psychiatrist prior to his decision denying benefits, (2) erroneously determined her RFC, (3) failed to develop the record regarding her mental impairment, and (4) erred in his hypothetical question to the VE.

We apply de novo review to a district court's denial of social security benefits. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). We must determine "whether

the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Id*. (quotation and citation omitted). We define "substantial evidence" as

> relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis. In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id*. (quotation and citation omitted). After we review the record, if we conclude that "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings," then we "must affirm the ALJ's decision." *Id*. (quotation and citation omitted).

An individual must be "disabled" to qualify for benefits under the Social Security Act and its regulations. *Id*. The Act considers an individual "disabled" "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The ALJ follows "the familiar five-step process" to determine whether an individual is disabled. *Halverson*, 600 F.3d at 929. The ALJ

> consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Id*.

A. *Due Process*

Martise asserts that the ALJ violated her due process rights by failing to proffer to her the letter that he sent to Dr. Berland and failing to allow Martise to respond to the letter prior to reaching his decision. Martise contends that a primary reason for the ALJ disagreeing with Dr. Berland's assessment of her disability was Dr. Berland's response to the ALJ's letter. According to Martise, had the ALJ followed due process and proffered the letter to her, then she could have made sure that the ALJ received the information that he considered important in order to properly weigh the opinion evidence from Dr. Berland.

We recently held that an ALJ's failure to notify a claimant of a post-hearing letter that he sent to the claimant's psychiatrist did not violate due process. *Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir. 2010). In *Hurd*, the treating psychiatrist had failed to complete a portion of the MSS "ask[ing] him to list his medical findings that supported his assessment." *Id*. at 737. After the administrative hearing was complete, the ALJ sent a letter to the claimant's treating psychiatrist "'to determine whether additional information is readily available to clarify your report/medical source statement.'" *Id*. The letter advised the psychiatrist that his "report was insufficient and stated that the additional information was required within ten days." *Id*. The ALJ received no reply from the psychiatrist. *Id*.

On appeal, the claimant asserted that the ALJ violated his due process rights by failing to proffer the letter to the claimant before sending it to his treating psychiatrist. *Id*. at 738. The claimant argued that, "had he known of the inquiry, he would have used 'his opportunity to be heard at a meaningful time regarding the weight of [the treating psychiatrist's] opinions.'" *Id*. We explained that, under the Fifth Amendment, procedural due process requires disability claimants to be afforded a full and fair hearing. *Id*. at 739. And, while this court has "not defined all that is required for a full and fair hearing, we have said that due process 'does not afford social security claimants an absolute right to cross-examine individuals who submit

-18-

a report.'" *Id*. (quoting *Passmore v. Astrue*, 533 F.3d 658, 665 (8th Cir. 2008)). In *Hurd*, the claimant had submitted the psychiatrist's written report but failed to call him as a witness at the hearing. *Id*. We found that the psychiatrist's

> report offered the opinion that [the claimant] was disabled, but his treatment notes do not reflect that he ever talked to [the claimant] about his ability to work. His opinion differed from that of the other examining physicians and of a state agency psychologist, yet [the psychiatrist] did not provide the medical findings that supported his assessment in spite of a specific request that he do so. The ALJ noted that [the psychiatrist] prepared his statement at the request of [the claimant's] attorney rather than in the course of treatment. Cumulatively, these reasons explain why the ALJ gave little weight to [the psychiatrist's] opinions. He was justified in doing so because [the psychiatrist] offered little more than a conclusory statement that was unsupported by medical evidence. *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008).

*Id*. The deficiencies in the psychiatrist's report showed why the ALJ sought additional information after submission of all evidence. *Id*. We also noted the psychiatrist's failure to respond. *Id*. As a result, we explained that

> [i]n the absence of additional evidence and contrary to what [the claimant] now argues, there was nothing more he could have offered concerning the weight that the ALJ should have afforded [the psychiatrist's] opinion. Yet, [the claimant] asserts that, had he known what the ALJ was asking [the psychiatrist], [the claimant] "could have ensured that the ALJ received the information that the ALJ deemed important." This comment is no more than speculation, as no evidence exists to suggest how [the psychiatrist] would have responded. We conclude that [the claimant's] due process rights were not violated.

*Id*.

We also rejected the claimant's alternative argument that "the ALJ violated agency regulations for the receipt of evidence by failing to notify [the claimant] of his letter to [the psychiatrist]" because the psychiatrist "failed to respond to the request for additional information, and therefore no post-hearing evidence was received." *Id*.

This case is substantially similar to *Hurd*. As in *Hurd*, "[t]he ALJ understandably sought additional information from [Dr. Berland] after he had received all the evidence," *id*., because, as the ALJ noted in his letter to Dr. Berland, Dr. Berland's report (1) contained conflicts that could not be reconciled with the medical evidence of record, including Martise's GAF score; (2) did not contain all the necessary information needed to assess the severity of Martise's impairments; (3) did not appear to be based upon medically acceptable clinical and laboratory diagnostic techniques; and (4) did not adequately address what Martise could do despite her impairments.

Furthermore, even though Dr. Berland, unlike the psychiatrist in *Hurd*, *did respond* to the ALJ's letter, he failed to offer any additional evidence. Thus, as in *Hurd*, "there was nothing more [Martise] could have offered concerning the weight that the ALJ should have afforded [Dr. Berland's] opinion." *Id*. Additionally, whereas the claimant in *Hurd* was not on notice that post-hearing correspondence occurred between the ALJ and the psychiatrist prior to the decision, Martise was, as she received a copy of the response letter that Dr. Berland sent to the ALJ prior to the ALJ's decision.

And, contrary to Martise's argument, there is no indication in the record that Dr. Berland's response letter indicating that he had no further evidence formed the basis for the ALJ's decision. As the district court noted, "the only reference to Dr. Berland's post-hearing letter in the ALJ's decision was a notation that further evidence had been solicited, but that Dr. Berland had replied that he had none to offer."

Therefore, we agree with the district court that

[b]ecause Dr. Berland's post-hearing letter did not supply any evidence that was not already in the record, and because the ALJ did not rely upon Dr. Berland's post-hearing letter in his decision to discredit Dr. Berland's findings and opinions and to deny plaintiff's application, it cannot be said that a due process violation exists.

Martise has failed to "'prove that [s]he was actually prejudiced by the lack of process afforded to h[er].'" *Wilburn v. Astrue*, 626 F.3d 999, 1003 (8th Cir. 2010) (quoting *Briones-Sanchez v. Heinauer*, 319 F.3d 324, 327 (8th Cir. 2003)).

## B. *RFC*

Martise maintains that the ALJ erred in determining her RFC by failing to (1) include limitations arising from her migraine headaches, (2) include limitations arising from certain impairments in combination, and (3) accord Dr. Berland's opinion sufficient weight.

"RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." *Leckenby v. Astrue*, 487 F.3d 626, 631 n.5 (8th Cir. 2007) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id*.

### 1. *Migraine Headaches*

Martise argues that the ALJ erred in finding that her migraine headaches were not a severe impairment because he failed to consider the records of Dr. Aisenstat and Dr. Berland. According to Martise, these records reveal over a ten-year history of treatment for migraine headaches.

A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)). The impairment

> must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms (see [20 C.F.R.] § 404.1527).

20 C.F.R. § 404.1508.

Here, the ALJ concluded that the record was inconsistent with allegations of a severe impairment because (1) no records existed of abnormal radiological studies or vascular or neurological abnormalities; (2) no neurological examinations were conducted; (3) no treating physician documented any findings "of specific limitations, lasting twelve consecutive months in duration, despite treatment and due to migraines"; (4) Martise reported to Dr. Berland that Elavil helped her migraines; and (5) Martise reported no migraines during a subsequent visit with Dr. Berland.

We agree with the district court that the record supports the ALJ's conclusion that Martise's migraine headaches were not a severe impairment. First, the record is void of any diagnostic testing, which the district court noted "may reasonably be expected if plaintiff were experiencing migraine headaches of the alarming frequency and severity she alleges."

Second, Martise worked for several years during which time she also sought regular treatment for migraine headaches; as the district court found, "there is no medical evidence in the record that her headaches have worsened." "[A] condition

-22-

that was not disabling during working years and has not worsened cannot be used to prove present disability." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

Third, the record reflects that Martise's migraine headaches responded to medication. For example, on May 31, 2005, Martise informed Dr. Berland that Elavil was helping her migraines, and, at her next appointment, she advised him that she had no migraines. Then, on January 25, 2006, she reported to Dr. Berland that Topamax "really helps" with her migraines, and she told Dr. Aisenstat's staff on July 19, 2006, that Topamax controlled her migraines. Because Martise's migraine headaches are controllable and amenable to treatment, they "do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009).

## 2. *Combination of Impairments*

Martise also argues that the ALJ failed to consider all of her impairments in combination pursuant to 20 C.F.R. § 404.1523, as she suffered from a herniated disc in her lower back, surgical treatment to her right arm, a left shoulder injury, and asthma. According to Martise, the ALJ did not sufficiently discuss or analyze the combined effect of these impairments.

A review of the record reveals that Martise's "conclusory statement is unfounded," *Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994), because, as the district court found, the ALJ "fully summarized all of plaintiff's medical records and separately discussed each of plaintiff's alleged impairments." The ALJ expressly found that Martise "does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments . . . ." Based on the ALJ's synopsis of Martise's medical records and discussion of each of Martise's alleged impairments, we conclude that the ALJ properly considered the combined effects of Martise's impairments. *See, e.g.*, *Hajek*, 30 F.3d at 92 (holding that ALJ properly considered combined effects of claimant's impairments where ALJ found that the claimant had a history of coronary artery disease, hernia repair, and chronic

-23-

obstructive pulmonary disease, but that the claimant did not have an impairment or combination of impairments that rendered him disabled); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) (holding that ALJ properly considered whether claimant's impairments in combination were disabling by "separately discussing [the claimant's] physical impairments, affective disorder, and complaints of pain, as well as her daily level of activities").

### 3. *Dr. Berland's Opinion*

Martise contends that the ALJ did not give Dr. Berland's opinion sufficient weight. According to Martise, as both an expert and a treating physician, Dr. Berland's opinion is entitled to more weight. Martise argues that the ALJ erroneously discredited Dr. Berland's opinion for the following reasons: (1) Dr. Berland's treatments of Martise included her children rather than separate sessions with Martise when, in fact, Dr. Berland saw Martise individually on 16 occasions, and (2) issues arising from the ALJ's ex parte letter to Dr. Berland. Martise also asserts that the ALJ cited no specific medical evidence contradicting Dr. Berland.

> We recognize that "a treating physician's opinion is generally entitled to substantial weight"; however, such an "opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009) (internal quotations and citation omitted). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Id.* at 879 (internal quotations and citations omitted). When deciding "how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations." *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotations and citation omitted).

*Brown*, 611 F.3d at 951–52. An ALJ may justifiably discount a treating physician's opinion when that opinion "is inconsistent with the physician's clinical treatment notes." *Davidson*, 578 F.3d at 843. Thus, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Halverson*, 600 F.3d at 929–30 (internal quotation and citation omitted).

Here, the ALJ afforded "less weight . . . to the [MSS] of Dr. Berland," finding that "his opinion is not supported by medical evidence." This finding was proper. First, the record supports the ALJ's finding that Martise "does not have separate sessions with Dr. Berland." As the district court explained:

> The ALJ . . . noted that, during the hearing, plaintiff testified that she did not have individual treatment sessions with Dr. Berland, but instead took her children with her for group sessions. Plaintiff challenges this finding, stating that it is "incorrect" because Dr. Berland's reports indicated that he saw plaintiff individually. However, during plaintiff's hearing, she answered "no" when asked whether she had separate sessions with Dr. Berland. (Tr. 31). Plaintiff then explained "[b]ecause when we go in and I take my kids in, and then if I tell him things are happening with my kids and then I tell him—start telling him how it's affecting me and then he helps my children and then he turns around and then he tries helping me at the same time." (*Id*.) The ALJ's observation that plaintiff "does not have separate sessions with Dr. Berland" is therefore not "incorrect," as plaintiff contends, but is instead in accord with plaintiff's own hearing testimony. (Tr. 20). In addition, the ALJ did not say that plaintiff had never had a separate session with Dr. Berland and . . . the lack of separate sessions was not the only reason the ALJ gave for his decision to give less weight to Dr. Berland's opinion. Finally, as the Commissioner correctly notes, the ALJ did not completely discredit Dr. Berland; he only decided to give Dr. Berland's opinion less weight in favor of the opinions of Drs. Aisenstat, plaintiff's long-term treating physicians, and Dr. Brown, who treated plaintiff's arm.

Second, with regard to Martise's argument that the ALJ erroneously disregarded Dr. Berland's opinion in part because of the issues arising out of the ALJ's ex parte letter to Dr. Berland, as explained *supra*, there is no indication in the record that Dr. Berland's response letter indicating that he had no further evidence formed the basis for the ALJ's decision. *See supra* Part II.A. In granting Dr. Berland's opinion less weight, the ALJ merely noted that Dr. Berland "reported he had no other documentation regarding claimant."

Finally, contrary to Martise's argument, the record supports the ALJ's conclusion that Dr. Berland's treatment notes contain inconsistencies and his opinion lacks medical support. As the district court adequately explained:

> In his treatment notes, Dr. Berland noted memory problems, but found that plaintiff's concentration appeared intact based on her ability to perform serial threes with no errors, and her ability to spell "world" correctly forward and backward. In addition, Dr. Berland's records are almost devoid of any medical findings, such as the results of any mental status examinations, to support the extreme limitations he noted in his MSS. When a treating physician's notes are inconsistent with his opinion, the Court may decline to give controlling weight to that opinion. *See Hacker* [*v. Barnhart*,] 459 F.3d [934,] 937 [(8th Cir. 2006)]. In addition, as the Commissioner correctly states, the Regulations and Eighth Circuit precedent clearly require that a medical opinion be well-supported by medical evidence to be entitled to substantial or controlling weight. 20 C.F.R. § 404.1527(d)(3); *Hacker*, 459 F.3d [at] 937.

> * * *

> [T]he ALJ specifically stated that he was giving Dr. Berland's MSS opinion less weight, in favor of the opinions of Drs. Aisenstat, because, *inter alia*, Dr. Berland's opinion was unsupported by medical evidence. The ALJ still found that plaintiff could only perform jobs requiring her to understand, remember, and carry out simple instructions and non-

detailed tasks; perform in a low-stress environment; and work without public contact. (Tr. 13). As the Commissioner notes, these limitations represent serious functional restrictions, and support the conclusion that the ALJ did not entirely reject Dr. Berland's opinion. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (The ALJ's finding that plaintiff was limited to sedentary work is itself a significant limitation, and reveals that the ALJ did give some credit to the opinion evidence).

Finally, the undersigned notes that it cannot be said that Dr. Berland's MSS opinion is consistent with the balance of the objective medical information in the administrative record. As noted above, the ALJ in this case conducted an exhaustive review of the medical evidence of record, and made specific factual findings regarding all of the objective medical evidence, noting, *inter alia*, that none of plaintiff's treating physicians indicated that plaintiff had serious functional restrictions. A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. *See Stormo v. Barnhart*, 377 F.3d 801, 805–06 (8th Cir. 2004); *Hogan* [*v. Apfel*], 239 F.3d [958,] 961 [(8th Cir. 2001)].

## C. *Mental Impairment*

Martise alleges that, after finding Dr. Berland's opinions unclear, the ALJ committed reversible error by not ordering a consultative examination regarding Martise's mental impairments.

We reject Martise's argument. While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Here, in contacting Dr. Berland via the post-hearing letter, the ALJ was providing Dr. Berland the opportunity to provide medical evidence for his opinion. But a lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The ALJ chose to credit the opinions of Martise's other treating and examining physicians, none of which indicated that Martise had serious functional restrictions. As the district court pointed out, the ALJ exhaustively reviewed the record medical evidence and made factual findings regarding this evidence. "[T]here is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence." *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

### D. *Hypothetical to VE*

Finally, Martise argues that the ALJ provided an improper hypothetical question to the VE because the question did not sufficiently account for limitations arising from her headaches, her severe combination of other impairments, or the limitations that Dr. Berland indicated. Therefore, Martise asserts that the question was not supported by the evidence, and the ALJ should have relied on the VE's answer to the second hypothetical question, which confirmed that Martise could not work.

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation and citation omitted). "The ALJ's hypothetical question included all of [Martise's] limitations found to exist by the ALJ and set forth in the ALJ's description of [Martise's] RFC." *Id*. Based on our previous conclusion, *see supra* Part II.B., that "the ALJ's findings of [Martise's] RFC are supported by substantial evidence," we hold that "[t]he hypothetical question was therefore proper, and the VE's answer

constituted substantial evidence supporting the Commissioner's denial of benefits." *Lacroix*, 465 F.3d at 889.

## III. *Conclusion*

Accordingly, we hold that substantial evidence on the record as a whole supports the ALJ's decision. We therefore affirm the judgment of the district court.

_____